# Exhibit 8

Exhibit 8
Page 77

February 27, 2026
*Via Email*

The Honorable A. Joel Richlin
United States District Court for the Central District of California
Edward R. Roybal Federal Building and United States Courthouse
Courtroom 780, 7th Floor
255 East Temple Street
Los Angeles, CA 90012-3332

**Re:**    ***Disney, et al v. Midjourney, Inc.*; Case No. 2:25-CV-05275-JAK-AJR**
**Joint Request for Discovery Conference**

Dear Magistrate Judge Richlin,

Defendant Midjourney, Inc. ("Midjourney") and Plaintiffs to the above-captioned action ("Plaintiffs") jointly submit this letter regarding certain of Midjourney's and Plaintiffs' responses and objections to requests for production and request for admission, detailed below.

The parties met and conferred on December 30 and 31, and February 17, but were unable to reach compromises concerning the matters addressed herein. The fact discovery cut-off is scheduled for September 21, 2026. The issues addressed by the Parties in this letter are without prejudice to the Parties' rights to seek relief in connection with other issues that the Parties have met and conferred on.

Pursuant to Magistrate Judge Richlin's procedures for discovery motions, the parties propose the following mutually agreeable times for a discovery conference with the Court: March 9, March 11 (after 11am),and March 12 (after 2pm).

The parties respectfully request the opportunity to submit full briefing as to any disputes that remain following that discovery conference.

**Plaintiffs Disney, Warner Bros. Discovery, and Universal's Discovery Requests to Midjourney:**

**Midjourney Subscriber Prompts and Outputs [Request for Production ("RFP") Nos. 43-45]**

> **RFP No. 43**: All Documents evidencing, reflecting, and/or discussing prompts submitted to the Service that mention any of Plaintiffs' Copyrighted Works.
>
> **RFP No. 44**: All prompts submitted to the Service that mention any of Plaintiffs' Copyrighted Works.
>
> **RFP No. 45**: All Documents that mention, discuss, evidence, and/or concern images or videos of Plaintiffs' Copyrighted Works generated and/or provided by or on the Service.

**Meet and Confer**: Midjourney has agreed to conduct a reasonable search for non-privileged documents in its possession, custody, or control that refer to the titles and characters in the complaints, including documents sufficient to show public prompts that references those titles and

1

Exhibit 8
Page 78

characters and associated images/videos.  Midjourney prompts and images are public by default, but some users opt not to make the prompts and images/videos public. The parties are at an impasse over Midjourney's refusal to produce documents reflecting user prompts and associated images/videos that were private, citing proportionality under Rule 26 and concerns around user privacy.

**Plaintiffs' Position:**  As alleged in the complaint, Plaintiff movie studios contend that Midjourney copies their copyrighted works and famous characters and makes images and videos with Plaintiffs' characters available to Midjourney users and subscribers on the Midjourney website based on text "prompts" that mention Plaintiffs' works and/or characters.  Midjourney denies Plaintiffs' claims.  In support of their claims, Plaintiffs served RFP Nos. 43-45.

Midjourney's limitation that it will only produce "publicly available" subscriber prompts and "publicly available" Midjourney outputs is improper and omits relevant documents that mention plaintiffs or plaintiffs' works.  Midjourney is a commercial service that generates and distributes infringing images and videos to its paying subscribers.  Each time Midjourney reproduces, or creates a derivative work of, and distributes an image or video to one of its subscribers that contains one of Plaintiffs' copyrighted characters, Midjourney is directly infringing that Plaintiff's exclusive right to reproduce, create derivative works, and distribute their copyrighted works. To be sure, if Midjourney subsequently makes those images and videos available publicly, that would be a separate, further act of infringement in violation of the Plaintiff's exclusive rights to publicly display and publicly perform their works.  But Midjourney's distribution of Plaintiff's copyrighted works, whether "public" or not, is still unlawful and central to the copyright claims at issue.  The materials Midjourney refuses to produce constitute direct evidence of direct copyright infringement of plaintiffs' works by Midjourney.  Midjourney's privacy objections are without merit because Plaintiffs are not seeking the identity of Midjourney's users; the information sought – images and videos featuring Plaintiffs' copyrighted works are not personal in nature; and there is a robust protective order in the case to address confidentiality concerns.

**Midjourney's Position:** By way of background, Midjourney is a groundbreaking AI research lab and developer of its widely used namesake image-generation platform.  Midjourney's AI models, like other state-of-the-art generative AI models, was trained on billions of publicly available images from the internet, through which the models learn visual concepts and enable users to create images of virtually anything they can imagine.  Billions of images have been created by Midjourney users since its inception in 2022.  Plaintiffs, meanwhile, are large film and television studios who allege that Midjourney violates their copyrights in certain film and television franchises, both because Midjourney allegedly trained its models on public images of Plaintiffs' films and television shows, and because Midjourney users are able to create images that feature certain film and television characters that Plaintiffs claim rights in.

Against this backdrop, Plaintiffs' requests seeking "[a]ll Documents evidencing, reflecting, and/or discussing prompts" and "[a]ll Documents that mention, discuss, evidence, and/or concern images or videos" are incredibly broad and not proportional.  Nonetheless, following extensive meet and confer discussions and follow-on negotiations with Plaintiffs, Midjourney has offered to conduct a reasonable search for documents sufficient to address Plaintiffs' stated needs, namely, documents sufficient to show public prompts that reference the asserted works and associated image and video outputs.  The parties are at an impasse only to the extent that Midjourney has refused to produce

2

Exhibit 8
Page 79

prompts and image / video outputs that are made in private (referred to as "stealth mode"), meaning they are not publicly displayed unless a user affirmatively shares or posts the output.

Midjourney user prompts and outputs are public by default, and the vast majority of uses of Midjourney are therefore public.  Images and videos generated by users in stealth mode account for a relatively small subset of total user prompts and outputs.  On the one hand, private prompts and outputs are cumulative of the public prompts and outputs that Midjourney has agreed to produce, and therefore have limited relevance, if any.  In particular, Plaintiffs' direct and indirect infringement theories do not hinge on whether Midjourney users created images of Plaintiffs' claimed characters in private —if Plaintiffs' legal theories are correct, then they can be proven with publicly available images of the same characters.  On the other hand, producing users' private images and videos, some of which may contain personally identifiable information (e.g., names, personal photos, etc.) or confidential business data, implicates significant legal and practical privacy concerns, and would impose a substantial burden on Midjourney to review and, potentially, redact materials for privacy purposes.  As a compromise, and without conceding the relevance of any stealth mode content generated by users outside of the U.S., Midjourney is prepared to apply the same search terms to private user prompts that it is applying to public user prompts in order to collect and produce data showing the volume of user prompts that hit on each search term.

**Documents Concerning Midjourney 3D Model Development [Request for Production No. 59]**

> **RFP No. 59**: All Documents that evidence, mention, discuss, and/or concern Your business plans for 3D models, real-time models and/or real-time open-world simulations as described in Your June 18, 2025 announcement, Introducing Our V1 Video Model (at https://updates.midjourney.com/introducing-our-v1-video-model/).

**Meet and confer:**  Plaintiffs proposed limiting the request to documents sufficient to show business plans for such 3D models to the extent they would use Plaintiffs' copyrighted works.  Midjourney has agreed to produce responsive documents insofar as they refer to Plaintiffs' asserted works.  Otherwise, Midjourney has refused to search for and produce documents on proportionality and relevance grounds.

**Plaintiffs' Position:**  Midjourney has publicly announced plans to expand its AI image/video generation service to offer so-called 3D models.  Plaintiffs are entitled to discovery on whether Midjourney intends to expand its infringement of Plaintiffs' copyrighted works in such 3D models (e.g., if Midjourney plans to offer its subscribers 3D virtual worlds that include Plaintiffs' copyrighted characters).  In addition to showing Midjourney's plans to expand its infringement of the copyright works at issue which is relevant to Plaintiffs' claim of direct copyright infringement against Midjourney (and threatened damages and irreparable harm), these documents are also relevant to the market harm analysis under the fourth fair use factor, a defense being asserted by Midjourney, because a 3D interactive experience using Plaintiffs' works would be a material threat to the markets for and value of Plaintiffs' copyrighted works.

**Midjourney's Position:**  Taking a step back, Plaintiffs' claims in this case are premised on Midjourney's training of image and video generation models and user outputs from those models.  ECF No. 1.   The complaint does not mention 3D models, real-time models, or real-time world simulations.  *Id*.  Accordingly, to the extent that Midjourney has future plans to potentially develop other models such as 3D model generators or world simulators they are outside the scope of the complaint and have no bearing on the issues in dispute.  Plaintiffs argue that such documents are

3

Exhibit 8
Page 80

relevant to a "market harm" analysis under the fourth fair use factor, but the "fourth factor focuses on actual or potential market substitution." *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1031 (N.D. Cal. 2025) (quoting *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 547 n.21(2023)).  By definition, there can be no market harm caused by a service or feature that does not exist. Meanwhile, in discovery, Plaintiffs have not produced or described any evidence of a lost license or other evidence of actual damages or loss, further undermining the argument advanced above that Plaintiffs may rely on "market harm" to justify entitlement to Midjourney's plans, if any, for such potential future models.

If Plaintiffs' interest in Midjourney's future plans is genuinely motivated by concern about "3D virtual worlds that include Plaintiffs' copyrighted characters," the broad discovery that Midjourney has agreed to is more than sufficient to address it.  For example, Midjourney has agreed to conduct a reasonable search for documents in its possession, custody, or control that refer to the titles and characters referenced in the Complaints.  Non-privileged documents located in connection with that search will be produced, including documents, if any, that concern "3D models" and "world simulations."

**Requests for Admission ("RFA") Concerning Authorization [RFA Nos. 13 & 15]**

> **RFA No. 13**: Admit that You did not have authorization from Plaintiffs to use Plaintiffs' Copyrighted Works to train Your Midjourney AI Models.

> **RFA No. 15**: Admit that You did not obtain authorization from Plaintiffs to use Plaintiffs' Copyrighted Works to train Your Midjourney AI Models.

**Meet and confer:**  Plaintiffs represented that the defined term "Plaintiffs' Copyrighted Works" refers to the copyrighted characters and works (movies, TV shows) specifically identified in the Complaints and listed in the exhibits to the Complaints.  Midjourney has responded that, at present, it lacks sufficient information to admit or deny the requests.

**Plaintiffs' Position:**  Plaintiffs allege in the complaint that they never authorized Midjourney to copy their movies, TV shows, and famous characters as part of Midjourney's image and video generation service. To avoid the time, expense, and burden of litigating an issue that should be undisputed, Plaintiffs served straightforward RFAs requiring Midjourney to admit Plaintiffs never authorized Midjourney to copy their works. Midjourney necessarily knows whether or not it has or obtained authorization from Plaintiffs to use Plaintiffs' works to train its AI models.  It cannot use purposefully convoluted objections to feign ignorance about whether or not it sought and obtained Plaintiffs' permission to copy and exploit their works.

**Midjourney's Position:**  Midjourney objected to and is presently unable to respond to these Requests for several reasons, including due to vagueness as to the defined term "Plaintiffs' Copyrighted Works" (which includes, but is not limited to, dozens of film and television titles and associated characters across multiple "Plaintiffs," which comprise over a dozen corporate entities), which also renders the requests compound.  Furthermore, the requests call for information that is in Plaintiffs' possession.   One of Midjourney's defenses is that Plaintiffs and/or agents working at their direction licensed Midjourney to train on certain of Plaintiffs' works.  ECF No. 20 at 39.  Specifically, every Midjourney user is required to click-accept Midjourney's Terms of Service, which authorize Midjourney to train on content uploaded to or created with the service.  And Midjourney is in possession of evidence indicating that Plaintiffs and/or their agents were both

Exhibit 8
Page 81

using Midjourney to create images of the asserted works, and may have uploaded images of the asserted works to the Midjourney platform as inputs for image and video prompts. However, the documents and information necessary to confirm that Plaintiffs are bound by Midjourney's Terms of Service (*i.e.*, documents evidencing Plaintiffs' express or implicit authorization to use Midjourney) are exclusively within Plaintiffs' possession, custody, or control; are actively being sought by Midjourney; and have not yet been produced by Plaintiffs. Until this discovery is completed, Midjourney is unable to complete its reasonable investigation and lacks knowledge or information sufficient to admit or deny RFA Nos. 13 and 15.

**Midjourney's Discovery Requests to Plaintiffs:**

**Requests for Production Concerning Plaintiffs' Gen AI Use [RFP Nos. 8, 10, 23-24]**

> **RFP No. 8:** All DOCUMENTS and COMMUNICATIONS CONCERNING any instances in which YOU approved the use of GENERATIVE AI TOOLS other than Midjourney's by YOUR EMPLOYEES or CONTRACTORS in connection with the creation, marketing, or exploitation of any motion picture, television episode, trailer, poster, consumer product, or other derivative of the ASSERTED WORKS.

**Meet and Confer:** Plaintiffs have agreed to search for and produce "non-privileged documents sufficient to show [Plaintiffs'] approval of the use of generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works."

**Midjourney's Position:** This case is about, among other things, Plaintiffs' attempt to impose sweeping liability on Midjourney's groundbreaking generative AI technology because it pursued an industry-standard practice of training its models on billions of publicly available images, a vanishingly small number of which Plaintiffs have asserted rights in. Plaintiffs contend that uses of generative AI tools other than Midjourney's services are irrelevant to their claims, but fair use contemplates "the public benefits the copying will likely produce." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 35 (2021); *see also Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992). Documents concerning Plaintiffs' uses of similarly trained generative AI tools in order to exploit the asserted works, including by creating images or videos (i.e., "outputs") for internal ideation, brainstorming, storyboarding, etc., will expose that Plaintiffs are benefitting from the same industry-standard practices that they are objecting to here and, correspondingly, challenge the credibility of Plaintiffs' selective insistence that such practices have injured them and fall outside the bounds of fair use. *See Burk v. CRISIS24*, Inc., 2025 WL 1723170, at *8 (C.D. Cal. May 7, 2025) (ordering discovery relevant to impeachment). Plaintiffs should be ordered to produce *all* documents concerning their approval of the use of generative AI to generate images and/or video outputs in connection with *any* marketing or exploitation of the asserted works, including internal uses.

**Plaintiffs' Position:** This is not a case about whether generative AI is good or bad. Plaintiffs are not challenging AI technology or generative AI as a general matter. And Plaintiffs are not seeking to shut down Midjourney's service. Plaintiffs are suing Midjourney because it *infringed Plaintiffs' copyrighted works* (also referred to as "the asserted works") by collecting and copying Plaintiffs' copyrighted material as part of its training process, storing copies of Plaintiffs' copyrighted

5

Exhibit 8
Page 82

characters in its AI model, and then reproducing, publicly displaying, publicly performing, and distributing images and videos with unauthorized copies of Plaintiffs' famous copyrighted characters. Plaintiffs have already agreed to produce the only arguably relevant documents sought by RFP No. 8 as they have agreed to produce documents concerning their use of generative AI to generate images and/or video outputs intended for consumers featuring the asserted works. This agreement addresses the evidence that may be relevant to the fourth factor of the fair use test, "the effect of [Midjourney's] use [of Plaintiffs' works] upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). But otherwise, *Plaintiffs' use* of other generative AI services is irrelevant to the fair use inquiry, which asks only if *Defendant's use* of Plaintiff's copyrighted works is fair. *See* 17 U.S.C. § 107. The cases cited by Midjourney say as much: Midjourney bears the burden of showing any "public benefits" stemming from *Midjourney's copying of Plaintiffs' works*—not whether there is some public benefit from Plaintiffs or anyone else copying some other works. *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 35 (2021). Magistrate Judge Ona Wang in SDNY addressed the same exact question in another copyright case against generative AI company OpenAI, where the defendant sought wide-ranging discovery into plaintiff's use of AI generally. The court held that the plaintiff's copyright lawsuit against OpenAI "is not a referendum on the benefits of Gen AI, on Plaintiff's business practices, or about whether any of Plaintiff's employees use Gen AI at work," and as such, "[t]he broad scope of document production sought here is simply not relevant to Defendant's purported fair use defense." *New York Times Co. v. Microsoft Corp.*, 757 F. Supp. 3d 594, 599 (S.D.N.Y. 2024) (denying motion to compel). The same is true here.

> **RFP No. 10:** DOCUMENTS sufficient to show any GENERATIVE AI TOOL tested or evaluated by YOU for use by YOUR EMPLOYEES or CONTRACTORS, including, but not limited to, vendor contracts, NDAs, statements of work, or research reports or analyses.

**Meet and Confer:** Following the parties' meet and confers, Midjourney has further limited this Request to image and video generation tools. Plaintiffs have agreed to search for and produce "documents regarding their employees' use of Midjourney for work and documents sufficient to show Plaintiffs' use of generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works."

**Midjourney's Position:** This Request is narrowly tailored to identify any testing and evaluation performed by Plaintiffs on generative AI tools. Like RFP No. 8, it is relevant to Plaintiffs' knowledge of, benefits from, and reliance on generative AI industry norms and technologies that they are alleging are unlawful here, regardless of whether the testing or evaluation concerned Midjourney specifically or resulted in consumer-facing outputs featuring the asserted works. To the extent that Plaintiffs' testing and evaluation of generative AI models included the creation of outputs that feature Plaintiffs' works or works of other parties (e.g., Disney employees creating images of Warner Bros. characters), such documents also bear on whether Midjourney is capable of substantial non-infringing uses and the extent to which user-generated images of third-party copyrighted works may be fair uses. Plaintiffs should be required to fully respond to this Request to the extent that they have engaged in testing and evaluation of generative AI tools capable of enabling users to create images and video.

6

Exhibit 8
Page 83

**Plaintiffs' Position:** Like RFP No. 8, this Request seeks broad swaths of information that are neither "relevant to any party's claim or defense" nor "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Again, Plaintiffs have agreed to produce documents that may be relevant to the fourth factor of the fair use test, namely, documents sufficient to show "Plaintiffs' use of generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works." *See* 17 U.S.C. § 107(4). Plaintiffs have further agreed to produce non-privileged documents about their work-related uses of Midjourney. But, as noted above, this lawsuit is not a challenge to AI or even to Midjourney's entire service, and it certainly does not open the door to an "audit" of Plaintiffs' use of AI generally. Plaintiffs' use of other AI services is irrelevant to whether Midjourney is infringing Plaintiffs' copyrights. This exact argument was considered and rejected by another district court. *See New York Times*, 757 F. Supp. 3d at 599 (denying motion to compel). Additionally, Midjourney's reliance on the "staple article of commerce" test, which asks whether Midjourney is "capable of substantial non-infringing uses," is a red herring. First, the staple article of commerce doctrine applies when a defendant sells a product (like a Sony VCR) that does not come pre-loaded with infringing content like Midjourney here. *Cf. Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984). Second, there is no dispute in this case that Midjourney also distributes images and videos that do not infringe Plaintiffs' works— Midjourney does not require discovery from Plaintiffs to prove that. Third, even if the staple article of commerce doctrine were relevant, it would still be limited to Midjourney, not every other AI service on the market, and Plaintiffs have otherwise agreed to produce relevant documents about Plaintiffs' use of Midjourney.

> **RFP No. 23**: To the extent not provided in response to the above Requests, produce all DOCUMENTS CONCERNING any instances in which any of YOUR CONTRACTORS or visual effects partners used GENERATIVE AI TOOLS other than Midjourney's in connection with the creation, marketing, or exploitation of any motion picture, television episode, trailer, poster, consumer product, or other derivative of the ASSERTED WORKS.

> **RFP No. 24**: To the extent not provided in response to the above Requests, produce all DOCUMENTS CONCERNING any instances in which any of YOUR EMPLOYEES or CONTRACTORS used GENERATIVE AI TOOLS other than Midjourney in connection with the creation, marketing, or exploitation of any motion picture, television episode, trailer, poster, consumer product, or other derivative of the ASSERTED WORKS.

**Meet and Confer:** Plaintiffs have agreed to produce "documents sufficient to show instances in which [Plaintiffs] authorized its employees or contractors to use generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works." Plaintiffs have refused to produce documents concerning uses of generative AI outputs that were not "intended for consumers."

**Midjourney's Position:** Plaintiffs' proposal is inadequate insofar as it is limited to "consumer-facing outputs." As noted in connection with other Requests, Plaintiffs' internal uses of generative AI tools are also highly relevant to the benefits that Plaintiffs are knowingly deriving from conduct that they are alleging is unlawful when undertaken by Midjourney, and the extent to which Plaintiffs view such tools as legitimate creative and commercial aids when it serves their interests. Their use of other generative AI systems that are similar to Midjourney, but which Plaintiffs have not objected to, also speaks to any purported injury suffered by Plaintiffs (or lack thereof).

Exhibit 8
Page 84

**Plaintiffs' Position:** As discussed above, whether Plaintiffs have used some other company's AI service for internal business purposes is completely irrelevant to the claims at issue: whether Midjourney infringed Plaintiffs' copyrights.  If Plaintiffs used an AI service in a way that was not meant for public consumption, it would also be irrelevant to the market harm fair use factor (because that use is not for consumers in the market).  This lawsuit is not about whether AI is good or bad, or whether Plaintiffs use AI in their business.  Because "market harm" is the only way Plaintiffs' use of AI could be relevant here, Plaintiffs will produce "documents sufficient to show instances in which [Plaintiffs] authorized its employees or contractors to use generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works."

**Requests for Production Concerning Plaintiffs' Gen AI Development [RFP Nos. 12, 13, 14, 25]**

> **RFP No. 12**: DOCUMENTS sufficient to show all business plans, roadmaps, research reports, or other studies CONCERNING YOUR actual or proposed development or training of any GENERATIVE AI TOOL.

**Meet and Confer:** Plaintiffs have agreed to produce "documents that are in [Plaintiffs'] possession, custody, or control, and that are located after a reasonable search, sufficient to show all business plans, roadmaps, research reports, or other studies concerning [Plaintiffs] actual or proposed development or training of any generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works."  Plaintiffs have refused to produce documents concerning development of image and video gen AI tools except to the extent that they are "intended for consumers" and "featur[e] the asserted works."

> **RFP No. 13**: DOCUMENTS sufficient to show YOUR development, training, or contemplated development or training of any GENERATIVE AI TOOL, including training datasets, data sources, or model weights.

**Meet and Confer:** Plaintiffs have agreed to produce "documents regarding their employees' use of Midjourney for work and documents sufficient to show Plaintiffs' use of generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works." Plaintiffs have refused to produce documents concerning development of image and video gen AI tools except to the extent that they are "intended for consumers" and "featur[e] the asserted works."

> **RFP No. 25**: All DOCUMENTS CONCERNING any THIRD-PARTY datasets that YOU have acquired or downloaded for use in connection with any AI tool, including but not limited to GENERATIVE AI TOOLS.

**Meet and Confer:** Midjourney agreed to narrow this Request to documents concerning third-party datasets acquired or downloaded by Plaintiffs for the purpose of training or developing generative AI models.  Midjourney agrees to further limit this Request to documents sufficient to show such datasets.  Plaintiffs have refused to produce any documents.

Exhibit 8
Page 85

**Midjourney's Position:** Plaintiffs' proposal improperly narrows these Requests to development and training of generative AI to generate image or video outputs "intended for consumers" and "featuring the asserted works." It would exclude development of models for internal uses, as well as models not specifically designed with the asserted works in mind, and it excludes Plaintiffs' acquisition of AI training data altogether. Plaintiffs' development and training of their own generative AI models, and their use of training data corpuses that are the same as or similar to those used by Midjourney (i.e., those containing third parties' copyrighted works), is highly relevant to Midjourney's fair use and unclean hands defenses (*see Grasshopper House, LLC v. Clean and Sober Media, LLC*, 394 F.Supp.3d 1073, 1102 (C.D. Cal. 2019) (finding unclean hands where the plaintiff engaged in "essentially the same" purportedly wrongful conduct as the defendant), and would contradict Plaintiffs' allegation that Midjourney's alleged infringement "threatens to upend the bedrock incentives of U.S. copyright law that drive American leadership in movies, television, and other creative arts." Dkt. 1, ¶ 2. Plaintiffs cannot credibly contend that training on publicly available data is infringing when Midjourney does it, but fair use when undertaken by Plaintiffs or on their behalf. Plaintiffs' selective—and potentially anticompetitive—reasoning is particularly acute in light of Disney's ownership stake in Midjourney competitor OpenAI.

**Plaintiffs' Position:** These requests seek immense amounts of irrelevant information regarding Plaintiffs' supposed development of generative AI. Again, this litigation is not about Plaintiffs' potential development of generative AI, and it is not about whether unknown third parties could potentially hold Plaintiffs liable for infringing third party copyrights; this case is solely about *whether Midjourney infringed Plaintiffs' copyrights*. Attempting to distract from its own liability, Midjourney upends the (rarely applied) doctrine of unclean hands. A defendant seeking to establish unclean hands "must demonstrate (1) inequitable conduct by the plaintiff; (2) that the plaintiff's conduct directly relates to the claim which it has asserted against the defendant; and (3) plaintiff's conduct injured the defendant." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.Supp.2d 1197, 1223 (C.D. Cal. 2007). The mere fact that Plaintiffs may or may not have pursued or "contemplated" development of their own generative AI models is not "unclean hands." Such documents could only be relevant to fair use if they evidence the potential market for Plaintiffs' works, *see* 17 U.S.C. § 107(4), which is why Plaintiffs have already agreed to produce documents sufficient to show "Plaintiffs' use of generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works."

### Requests for Production Concerning Plaintiffs' Gen AI Policies [RFP Nos. 14, 21]

**RFP No. 14:** All DOCUMENTS and COMMUNICATIONS REFLECTING statements by YOUR corporate officers CONCERNING YOUR policy towards, use of, or development of GENERATIVE AI TOOLS.

**Meet and Confer:** Plaintiffs have agreed to produce "non-privileged documents that are in [Plaintiffs'] possession, custody, or control, and that are located after a reasonable search, reflecting statements by [Plaintiffs'] corporate officers made on [Plaintiffs'] behalf concerning [Plaintiffs'] policy towards, use of, or development of generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works."

9

Exhibit 8
Page 86

**Midjourney's Position:** Plaintiffs' limitation to statements concerning uses of generative AI to create outputs "intended for consumers" and "featuring the asserted works" would improperly exclude more general statements concerning Plaintiffs' AI policies.  It may be that Plaintiffs' policies are discussed at a level of abstraction that does not specifically address consumer-facing outputs or the asserted works, in which case Plaintiffs are offering to produce nothing at all.  In any event, internal deliberations among Plaintiffs' officers concerning their messaging around generative AI policies—whether concerning the asserted works and consumer-facing outputs or otherwise—are highly relevant to Plaintiffs' own uses of and plans to use generative AI, the perceived benefits of Midjourney and other generative AI tools, and the extent to which Plaintiffs' posturing in litigation aligns with their internal views on copyright, market harm, and business objectives.

**Plaintiffs' Position:**  Again, Midjourney claims that every one of "Plaintiffs' own uses of and plans to use generative AI" is relevant, but that is wrong.  The only relevance of Plaintiff's use of generative AI is to show how Midjourney's AI service uses Plaintiffs' copyrighted works in a way that harms the potential market for Plaintiff's works.  That is why Plaintiffs have agreed to search for and produce documents that show how Plaintiffs may also be using image/video generative AI to create outputs with the works at issue and intended for consumers (i.e., similar to Midjourney's service).  *See* 17 U.S.C. § 107(4).  But "[w]hether nonparties' Gen AI tools confer benefits on the [motion picture] industry is not relevant to a determination of whether Defendant's acts—i.e., the alleged copying involving Defendant's Gen AI tools—constitute fair use," since "[t]he fair use factors are concerned with '*the copier's use* of an original work.'"  *New York Times*, 757 F. Supp. 3d at 598–99 (quoting *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023)).

> **RFP No. 21:** "DOCUMENTS sufficient to show all Board of Directors minutes, presentations, or executive-level briefings CONCERNING GENERATIVE AI TOOLS."

**Meet and Confer:** Plaintiffs have agreed to produce "documents that are in [Plaintiffs'] possession, custody, or control, and that are located after a reasonable search, sufficient to show Board of Directors minutes, presentations, or executive-level briefings, if any, concerning Midjourney."

**Midjourney's Position:** Plaintiffs' limitation to Board minutes and executive materials "concerning Midjourney" improperly excludes broader discussions of generative AI that bear directly on, among other things, Plaintiffs' internal views on generative AI tools and their actual and anticipated benefits, perceptions of market harm from generative AI (or lack thereof) and whether there's a workable market to license works for gen AI uses (*see VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 744 (9th Cir. 2019)), Plaintiffs' actual or intended uses of generative AI, investments in generative AI, and deliberations around their public messaging strategy with respect to the foregoing. Board meetings and executive briefings are precisely where many companies, including Plaintiffs, are likely to evaluate emerging technologies, weigh legal and policy concerns, and align public messaging with business objectives. Confining production to materials that explicitly concern Midjourney ignores the relevance of Plaintiffs' discussions of other, similarly situated generative AI tools and the reality that any discussion of generative AI may have been done using technology or industry-wide terms.  Moreover, Disney recently took a significant ownership stake in Midjourney competitor OpenAI, which, like Midjourney, is widely understood

Exhibit 8
Page 87

to have trained its models on public data sources.  The Disney Plaintiffs' executive briefings on the OpenAI investment and its impact on Disney and generative AI competitors should not hinge on whether Midjourney is explicitly referenced.  Plaintiffs should be required to produce documents sufficient to show all such board minutes, presentations, and executive-level briefings.

**Plaintiffs' Position:** Here too, "Plaintiffs' internal views on generative AI tools and their actual and anticipated benefits" are not "relevant to any party's claim or defense" nor "proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  This is a copyright infringement case; not an audit of Plaintiffs' feelings about AI technology.  For purposes of the fair use analysis, the relevant question is "the effect of [*Midjourney's*] use upon the potential market for or value of the copyrighted work[s]."  17 U.S.C. § 107(4).  Plaintiffs' board members' general views on generative AI are not relevant to Midjourney's infringement of Plaintiffs' works or the effect Midjourney's infringement has on the market for Plaintiffs' works, and Plaintiffs have already agreed to produce documents sufficient to show Board of Directors minutes, presentations, or executive-level briefings, if any, concerning Midjourney. To the extent Midjourney requires information about Disney's agreement with OpenAI, Disney has already separately agreed to produce documents sufficient to show that agreement in response to Midjourney's Second Set of Requests for Production.

**Requests for Production Concerning Plaintiffs' Use of Midjourney in Connection with Preparing the Complaint [RFP Nos 16]**

> **RFP No. 16:** DOCUMENTS sufficient to identify the PROMPTS used to create the purported "Midjourney" image(s) shown in the COMPLAINT, and all other PROMPTS submitted by YOU or other PERSON(S) to Midjourney in connection with attempts to generate each image shown in the COMPLAINT (including PROMPTS that resulted in images not shown in the COMPLAINT), and all OUTPUTS generated in response to such PROMPTS.

**Meet and Confer:** Plaintiffs' have agreed to produce prompts and outputs that are incorporated in the complaints, but have refused to produce other prompts and outputs that were created as a part of the same process of creating images for the complaints.

**Midjourney's Position:** It is well settled that a party may not wield the attorney-client privilege and work product doctrine as both a sword and a shield, selectively relying on documents to support claims while withholding related materials that would place those documents in context or undermine the narrative they advance. *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) ("[T]he privilege which protects attorney-client communications may not be used both as a sword and a shield.").  Yet that is precisely what Plaintiffs attempt to do here.  They have tacitly acknowledged that the Midjourney user images incorporated in the complaints (*see e.g.*, Dkt. 1 at ¶¶ 8, 11, 82-112) were curated from a larger set of images that Plaintiffs or their agents created for that purpose, but have refused to produce any of the images that were not selected for inclusion.  These undisclosed images are relevant to, among other things, the aesthetics that Plaintiffs targeted for inclusion in the complaints, whether the exemplars pleaded in the complaints are representative or instead cherry-picked, Plaintiffs' generation of even more highly transformative images featuring their works (e.g., images featuring political or social commentary)

11

Exhibit 8
Page 88

and/or images featuring the works of third-parties, both of which would support Midjourney's fair use defense. Furthermore, Plaintiffs have asked Midjourney to produce Midjourney user prompts and images that may incorporate Plaintiffs' works. To the extent that Plaintiffs are going to claim that particular images generated by Midjourney users are infringing, or if they rely on some aggregate number of purportedly infringing images derived from documents produced by Midjourney, Midjourney is also entitled to know whether any of those images were created by Plaintiffs or at their direction. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984) (explaining that "anyone who is authorized by the copyright owner to use the copyrighted work … is not an infringer of the copyright with respect to such use.").

Plaintiffs, by putting their own images at issue and indicating an intent to proffer them as evidence, thus waived any work product protection for other, undisclosed images responsive to RFP No. 16. *See Concord Music Grp., Inc. v. Anthropic PBC,* 2025 WL 3677935, at *3 (N.D. Cal. Dec. 18, 2025) (ordering production of prompts and outputs from Plaintiffs' investigators and client-witnesses). Work product is waived for the additional reason that Plaintiffs' submission of prompts to Midjourney is effectively disclosure to "an adversary" and "under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary.'" *United States v. Sanmina Corp.*, 968 F.3d 1107, 1120 (9th Cir. 2020).

**Plaintiffs' Position:** Plaintiffs have agreed to produce the prompts and outputs that they have put at issue in this litigation. But Midjourney seeks to compel production of additional documents that are at the heart of the work product doctrine: undisclosed prompts that Plaintiffs' counsel submitted (or directed agents to submit) to the Midjourney AI service as part of counsel's pre-suit investigation to prepare for litigation, as well as the undisclosed outputs Midjourney's service generated in response to those prompts. To be clear, these prompts and outputs are not part of the complaint; Plaintiffs have agreed to produce the prompts and outputs in the complaint. Federal courts addressing the same question have held that plaintiffs in generative AI cases do not waive work product protection for undisclosed attorney work product prompts and outputs in connection with preparing a complaint. In *Tremblay v. OpenAI, Inc.*, Judge Araceli Martínez-Olguín in fact *denied* OpenAI's motion to compel production of plaintiffs' pre-suit investigation beyond the prompts and outputs at issue in the complaint. 2024 WL 3748003, at *3 (N.D. Cal. Aug. 8, 2024). Midjourney relies on the discovery orders in *Concord Music Grp., Inc. v. Anthropic PBC*, but those orders support Plaintiffs' positions. The Court in *Concord* held that prompts and outputs in pre-suit investigations that were not disclosed in the complaint were undiscoverable work product. *Concord Music Grp., Inc. v. Anthropic PBC*, 2025 WL 1482734, at *1 (N.D. Cal. May 23, 2025). The *Concord* order relied on by Midjourney does not relate to prompts and outputs from plaintiffs' pre-suit investigation, but rather to a separate claim about post-suit investigation about guardrails. *Concord Music Grp., Inc. v. Anthropic PBC,* 2025 WL 3677935, at *3 (N.D. Cal. Dec. 18, 2025). Here, RFP No. 16 is only about the Complaint and Plaintiffs' pre-suit investigation, which is all work product. To the extent that Midjourney contends that Plaintiffs waive work product protection for *every* prompt submitted by Plaintiffs' counsel to Midjourney's AI service merely because Midjourney operates the service, the court should reject any such claim of blanket waiver of work product. This would put Plaintiffs' counsel at a material disadvantage, effectively barring counsel from testing the unlawful service at issue to develop legal strategy for their clients and to prepare for trial.

12

Exhibit 8
Page 89