**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DISNEY ENTERPRISES, INC., ET AL.; WARNER BROS. ENTERTAINMENT, INC., ET AL., <br><br> Plaintiffs, <br> v. <br><br> MIDJOURNEY, INC., <br><br> Defendant. | 2:25-cv-05275-JAK-AJR <br><br> **MEMORANDUM DECISION AND ORDER GRANTING IN PART AN DENYING IN PART DEFENDANT'S MOTION TO COMPEL (DKT. 55)** |

**I.**

**INTRODUCTION**

This is a consolidated copyright infringement action combining two lawsuits by leading content producers against Defendant Midjourney, Inc. ("Defendant" or "Midjourney"), a leading independent AI research lab, and the developer of its namesake image and video generation platform. (Dkts. 28-29.) The plaintiffs in the first action under Case No. CV 2505275-JAK-AJR are Disney Enterprises, Inc., Marvel Characters, Inc., MVL Film Finance LLC, Lucasfilm Ltd. LLC, and Twentieth Century Fox Film Corporation (collectively, the "Disney Parties"), and Universal City Studios Productions LLLP and DreamWorks Animation L.L.C.

(collectively, the "Universal Parties").  (Dkt. 28.)  The plaintiffs in the second action under Case No. CV 25-8376-JAK-E are Warner Entertainment Inc., DC Comics, Turner Entertainment Co., Hanna-Barbera Productions, Inc., and The Cartoon Network, Inc. (collectively, the "Warner Bros. Discovery Parties").  (Id.)  The parties stipulated that the two actions would be consolidated and proceed under Case No. CV 25-5275-JAK-AJR.  (Id.)

Midjourney's AI models are "diffusion models" – a technology that is to state-of-the art image and video generation AI tools what the large language models ("LLMs") are to chatbots like ChatGPT.  (Dkt. 55-1 at 3.)  To understand visual patterns and concepts, state-of-the-art diffusion models must be trained on billions of images, enabling them to create novel content in response to user prompts.  (Id.)  The Disney Parties, Universal Parties, and Warner Bros. Discovery Parties (collectively, "Plaintiffs") own the copyrights to some of the most iconic characters of all time.  (Dkt. 60 at 6.)  Plaintiffs contend that Defendant infringed Plaintiffs' copyrights by training Defendant's AI models using copies of Plaintiffs' copyrighted works and then distributing copies of those characters in images and videos to Defendant's subscribers.  (Id.)

Presently before the Court is Defendant's Motion to Compel filed on March 27, 2026 (the "Motion to Compel") seeking to compel Plaintiffs to produce documents and electronically stored information ("ESI") concerning Plaintiffs' development, use of, and policies regarding generative AI.  (Dkt. 55.)  On April 10, 2026, Defendant filed an Opposition to the Motion to Compel (the "Opposition").  The Court previously advised that it would take the Motion to Compel under submission without a hearing or a reply, unless a hearing was specifically requested or the Court had questions.  (Dkt. 49 at 3.)  The Court has considered all the briefs

and takes the Motion to Compel under submission without a hearing.[1]  See Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.  For the reasons set forth below, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion to Compel.  (Dkt. 55.)

## II.

## THE DISCOVERY AT ISSUE

Defendant seeks to compel Plaintiffs to produce: "(1) documents concerning their development, use of, and policies regarding generative artificial intelligence ('AI') tools for image and video creation, and (2) the complete set of Midjourney prompts and outputs that Plaintiffs (or their agents) used."  (Dkt. 55-1 at 2.)  Specifically, Defendant seeks to compel further responses to requests for production ("RFP") seeking Plaintiffs' training and development of their own AI models (RFP Nos. 12, 13, 25), use of image and video AI (RFP Nos. 8, 10, 23-24), and AI policies (RFP Nos. 14, 21).  (Id.)  Defendant also seeks to compel Plaintiffs to produce the prompts that they and their agents submitted to Midjourney (and corresponding outputs) not featured in the operative Complaints (RFP No. 16).  (Id. at 3-4.)  The Court sets forth the specific RFPs and Plaintiffs' responses below.

**(1)    Plaintiffs' Training and Development of Their Own AI Models (RFP Nos. 12, 13, 25):**

**RFP No. 12:**  "DOCUMENTS sufficient to show all business plans, roadmaps, research reports, or other studies CONCERNING YOUR actual or proposed development or training of any GENERATIVE AI TOOL."  (Dkt. 55-4 at 6.)

**Plaintiffs' Responses in Relevant Part:**  Plaintiffs agreed to produce

---

[1] Neither side requested a hearing and the Court does not have questions for the parties.

3

nonprivileged responsive documents "concerning [Plaintiffs'] actual or proposed development or training of any generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works." (Id.)[2]

**RFP No. 13:** "DOCUMENTS sufficient to show YOUR development, training, or contemplated development or training of any GENERATIVE AI TOOL, including training datasets, data sources, or model weights." (Id.)

**Plaintiffs' Responses in Relevant Part:** Plaintiffs objected to producing responsive documents. (Id. at 7.)

**RFP No. 25:** "All DOCUMENTS CONCERNING any THIRD-PARTY datasets that YOU have acquired or downloaded for use in connection with any AI tool, including but not limited to GENERATIVE AI TOOLS." (Id. at 13.)

**Plaintiffs' Responses in Relevant Part:** Plaintiffs objected to producing responsive documents. (Id. at 14.)

**(2)    Plaintiffs' Use of Image and Video AI (RFP Nos. 8, 10, 23-24):**

**RFP No. 8:** "All DOCUMENTS and COMMUNICATIONS CONCERNING any instances in which YOU approved the use of GENERATIVE AI TOOLS other than Midjourney's by YOUR EMPLOYEES or CONTRACTORS in connection with the creation, marketing, or exploitation of any motion picture, television episode, trailer, poster, consumer product, or other derivative of the ASSERTED WORKS." (Id. at 3.)

**Plaintiffs' Responses in Relevant Part:** Plaintiffs agreed to produce nonprivileged responsive documents "sufficient to show [Plaintiffs'] approval of the use of generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works." (Id.)

**RFP No. 10:** "DOCUMENTS sufficient to show any GENERATIVE AI

---

[2] The Court cites to the response of the Disney Parties as representative of the responses served by Plaintiffs.

4

TOOL tested or evaluated by YOU for use by YOUR EMPLOYEES or CONTRACTORS, including, but not limited to, vendor contracts, NDAs, statements of work, or research reports or analyses." (Id. at 4-5.)

**Plaintiffs' Responses in Relevant Part:** Plaintiffs objected to producing responsive documents. (Id. at 5.)

**RFP No. 23:** "To the extent not provided in response to the above Requests, produce all DOCUMENTS CONCERNING any instances in which any of YOUR CONTRACTORS or visual effects partners used GENERATIVE AI TOOLS other than Midjourney's in connection with the creation, marketing, or exploitation of any motion picture, television episode, trailer, poster, consumer product, or other derivative of the ASSERTED WORKS." (Id. at 11.)

**Plaintiffs' Responses in Relevant Part:** Plaintiffs agreed to produce nonprivileged responsive documents "sufficient to show instances in which [Plaintiffs] authorized contractors to use generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works." (Id. at 12.) Plaintiffs further responded that they would "construe 'CONTRACTOR' to mean any person other than an employee whom [Plaintiffs] has retained to provide goods or services under terms defined by a contract between [Plaintiffs] and the contractor." (Id.)

**RFP No. 24:** "To the extent not provided in response to the above Requests, produce all DOCUMENTS CONCERNING any instances in which any of YOUR EMPLOYEES or CONTRACTORS used GENERATIVE AI TOOLS other than Midjourney in connection with the creation, marketing, or exploitation of any motion picture, television episode, trailer, poster, consumer product, or other derivative of the ASSERTED WORKS." (Id.)

**Plaintiffs' Responses in Relevant Part:** Plaintiffs agreed to produce nonprivileged responsive documents "sufficient to show instances in which [Plaintiffs] authorized its employees or contractors to use generative AI to generate

5

images and/or video outputs intended for consumers, featuring the asserted works." (Id. at 13.)  Plaintiffs further responded that they would "construe 'CONTRACTOR' to mean any person other than an employee whom [Plaintiffs] has retained to provide goods or services under terms defined by a contract between [Plaintiffs] and the contractor."  (Id.)

**(3)    Plaintiffs' AI Policies (RFP Nos. 14, 21):**

**RFP No. 14:**  "All DOCUMENTS and COMMUNICATIONS REFLECTING statements by YOUR corporate officers CONCERNING YOUR policy towards, use of, or development of GENERATIVE AI TOOLS."  (Id. at 7.)

**Plaintiffs' Responses in Relevant Part:**  Plaintiffs agreed to produce nonprivileged responsive documents "reflecting statements by [Plaintiffs'] corporate officers made on [Plaintiffs'] behalf concerning [Plaintiffs'] policy towards, use of, or development of generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works."  (Id. at 8.)

**RFP No. 21:**  "DOCUMENTS sufficient to show all Board of Directors minutes, presentations, or executive-level briefings CONCERNING GENERATIVE AI TOOLS."  (Id. at 10.)

**Plaintiffs' Responses in Relevant Part:**  Plaintiffs agreed to produce nonprivileged responsive documents "sufficient to show Board of Directors minutes, presentations, or executive-level briefings, if any, concerning Midjourney."  (Id.)

**(4)    Plaintiffs' Prompts and Outputs to and from Midjourney (RFP No. 16):**

**RFP No. 16:**  "DOCUMENTS sufficient to identify the PROMPTS used to create the purported "Midjourney" image(s) shown in the COMPLAINT, and all other PROMPTS submitted by YOU or other PERSON(S) to Midjourney in connection with attempts to generate each image shown in the COMPLAINT (including PROMPTS that resulted in images not shown in the COMPLAINT), and all OUTPUTS generated in response to such PROMPTS."  (Id. at 8-9.)

**Plaintiffs' Responses in Relevant Part:**  Plaintiffs agreed to produce nonprivileged responsive documents "sufficient to identify the prompts used to create the image[s] generated by Midjourney shown in the complaint and put at issue in this action, and the side-by-side outputs contemporaneously generated in response to such prompts."  (Id. at 9.)

### III.

### LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) governs the scope of discovery in federal cases and provides that parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.  Federal Rule of Evidence 401 provides that evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Relevance under Rule 26(b)(1) is defined broadly.  See, e.g., Snipes v. United States, 334 F.R.D. 548, 550 (N.D. Cal. 2020); V5 Techs. v. Switch, Ltd., 334 F.R.D. 306, 309 (D. Nev. 2019) (noting that relevance for discovery purposes remains broad even after the 2015 amendments of the Federal Rules of Civil Procedure), aff'd sub nom., V5 Techs., LLC v. Switch, LTD., 2020 WL 1042515 (D. Nev. Mar. 3, 2020).  In addition to relevance, Rule 26(b)(1) requires that discovery be proportional to the needs of the case.  Proportionality is determined by a consideration of the following factors: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  "Information within this scope of discovery need not be admissible in evidence to be discoverable."  Id.

Under Rule 34, a party may serve on any other party a request for production of documents, ESI, or tangible things within the scope of Rule 26(b).  Fed. R. Civ. P.

7

34(a).  For each request, the response must either state that the responding party will produce copies of documents or electronically stored information as requested or state with specificity the grounds for objecting to the request, including the reasons.  See Fed. R. Civ. P. 34(b)(2)(B).  "An objection must state whether any responsive materials are being withheld on the basis of that objection."  Fed. R. Civ. P. 34(b)(2)(C).  An objection to only part of a request must specify the part that is being objected to and the part where the responding party will comply.  See id.

Where a party fails to comply with discovery requests, the requesting party may move to compel discovery.  Fed. R. Civ. P. 37(a).  "Upon a motion to compel discovery, the movant has the initial burden of demonstrating relevance."  Nguyen v. Lotus by Johnny Dung Inc., 2019 WL 3064479, at *2 (C.D. Cal. June 5, 2019) (internal quotation marks omitted).  "Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."  Garces v. Pickett, 2021 WL 978540, at *2 (E.D. Cal. Mar. 16, 2021).  "The opposing party is required to carry a heavy burden of showing why discovery was denied."  Id. (internal quotation marks omitted).  Specifically, the party opposing discovery must show that the requested discovery is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive, the party seeking discovery has had ample opportunity to obtain the information by discovery in the action, or the proposed discovery is outside the scope permitted by Rule 26(b)(1).  See Fed. R. Civ. P. 26(b)(2)(C).  The opposing party must specifically detail the reason why the request is improper.  See Beckman Indus., Inc. v. Int'l Ins. Co., 966 F.2d 470, 476 (9th Cir. 1992) ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." (internal quotation marks omitted)).

If a motion to compel is granted, "the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the

party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). However, the court must not order this payment if the movant filed the motion before attempting in good faith to obtain agreement from the opposing party without court action, the opposing party's position was substantially justified, or other circumstances make an award of expenses unjust. Fed. R. Civ. P. 37(a)(5)(A)(i)-(iii). By contrast, where a motion to compel is denied, the court "must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party . . . who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(B). However, "the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust." Id. Finally, if a motion to compel is granted in part and denied in part, the court "may, after giving an opportunity to be heard, apportion the reasonable expenses of the motion." Fed. R. Civ. P. 37(a)(5)(C).

## IV.

## DISCUSSION

For the reasons set forth below, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion to Compel. (Dkt. 55.) The Court will address Defendant's discovery requests raised in the motion in the same order that Defendant addresses them.

**A.** **Plaintiffs' Development, Use of, and Policies Regarding Generative AI (RFP Nos. 8, 10, 12, 13, 14, 21, 23, 24, 25):**

As set forth above, there are three groups of RFPs that broadly seek documents related to Plaintiffs' development, use of, and policies regarding generative AI. The first group is RFP Nos. 12, 13, and 25 that seek documents related to Plaintiffs' training and development of their own AI models. (Dkt. 55-4 at 6, 13.) The second

group is RFP Nos. 8, 10, 23, and 24 that seek documents related to Plaintiffs' use of image and video AI.  (Id. at 3, 4-5, 11-12.)  The third group is RFP Nos. 14 and 21 that seek documents related to Plaintiffs' AI policies.  (Id. at 7, 10.)

Defendant contends that the discovery requested in these three groups of RFPs is relevant to both its defense of fair use, as well as its equitable defense of unclean hands.  (Dkt. 55-1 at 5-9.)  The Court will first address the defense of fair use and then address the defense of unclean hands.  Under the Copyright Act, "the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."  17 U.S.C. § 107.  The Copyright Act identifies the following four non-exhaustive factors that should be considered to determine if the use of a copyrighted work qualifies as fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

Id.  Finally, the Copyright Act states that "[t]he fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors."  Id.

Here, Defendant contends that the requested discovery is relevant to the following fair-use factors:  (1) transformativeness; (2) public benefits; (3) market harm; and (4) industry custom and practice.  (Dkt. 55-1 at 5-8.)  The Court will address each factor below in turn.

1.    **Transformativeness.**

The first fair-use factor listed in the Copyright Act is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).  The Ninth Circuit has explained that even though this first factor does not use the word "transformative," the "central purpose" of the first-factor inquiry is to determine "whether and to what extent the new work is transformative." Dr. Seuss Enters., L.P. v. ComicMix LLC, 983 F.3d 443, 452 (9th Cir. 2020) (internal quotation marks omitted). "Transformative use of the original work can tip the first factor in favor of fair use." Id.  The Ninth Circuit further explained that "[a] transformative work adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Id. (internal quotation marks omitted).  "On the other hand, a work that merely supersedes the objects of the original creation is not transformative." Id. (internal quotation marks omitted).

Defendant contends that "if Plaintiffs are developing and deploying diffusion models (employing the same technology, training techniques, and public data as Midjourney), that is a powerful concession that such models produce something fundamentally new and useful—relevant evidence of the transformative nature of that (and Midjourney's) technology." (Dkt. 55-1 at 6.)  However, Defendant does not cite any case law or further explain this conclusory assertion contained in a single sentence.  (Id.)  By contrast, the Court concludes that the Supreme Court's leading precedent on the scope of the fair-use inquiry compels the conclusion that Plaintiffs' use of diffusion models, if any, would not be relevant to whether Defendant's use of Plaintiffs' copyrighted works qualify as transformative.  Indeed, the Supreme Court has explained that the first-factor inquiry focuses on "the reasons for, and nature of, the copier's use of an original work" and requires analysis of the specific use alleged to be infringing, since "the same copying may be fair when used for one purpose but not another." Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith, 598 U.S.

11

508, 529, 533 (2023) (emphasis added).

The U.S. District Court for the Southern District of New York recently reached the same conclusion in a similar case, explaining that "the relevant inquiry under the first fair use factor concerns a <u>defendant's use of a plaintiff's copyrighted material</u>, not a downstream use of defendant's allegedly infringing material by a copyright-holder plaintiff." <u>In re OpenAI, Inc., Copyright Infringement Litig.</u>, 800 F. Supp. 3d 602, 608 (S.D.N.Y. 2025) (emphasis in original). Thus, the <u>In re Open AI, Inc., Copyright Infringement Litig.</u> court concluded that the plaintiff's use of generative AI was not relevant to whether the defendants' use of the plaintiff's copyrighted works qualified as transformative. <u>See id.</u> at 608-09. This Court agrees with the rationale and conclusion from <u>In re Open AI, Inc., Copyright Infringement Litig.</u>

The same judge from <u>In re Open AI, Inc., Copyright Infringement Litig.</u> also reached the same conclusion in another similar copyright infringement case in <u>New York Times Co. v. Microsoft Corp.</u>, 757 F. Supp. 3d 594 (S.D.N.Y. 2024). In that case, the U.S. District Court for the Southern District of New York also concluded that the plaintiff's use of generative AI was not relevant to whether the defendant's use of the plaintiff's copyrighted works qualified as transformative. <u>See New York Times Co.</u>, 757 F. Supp. 3d at 597. Specifically, the court explained that the fair-use factors "do <u>not</u> require a court to examine statements or comments a copyright holder may have made about a defendant's general industry, whether the copyright holder has used tools in the defendant's general industry, whether the copyright holder has admitted that other uses of its copyrights may or may not constitute fair use, or whether the copyright holder has entered into business relationships with other entities in the defendant's industry." <u>Id.</u> (emphasis in original). Thus, the <u>New York Times Co.</u> court denied the defendant's request for discovery into the plaintiff's use of third-party generative AI tools, creation and use of their own generative AI tools, and position regarding generative AI generally. <u>Id.</u> at 597-99.

This Court agrees with the rationale and conclusion from New York Times Co. Accordingly, the Court concludes that Defendant's discovery requests seeking documents related to Plaintiffs' development, use of, and policies regarding generative AI are not relevant to the first factor of the fair-use inquiry.

## 2.    **Public Benefits.**

Defendant next contends that in assessing fair use, "courts routinely consider the benefits conferred when similarly situated parties engaged in the accused conduct." (Dkt. 55-1 at 6-7 (citing Google LLC v. Oracle Am., Inc., 593 U.S. 1, 32 (2021); Sony Computer Ent. Am., Inc. v. Bleem, LLC, 214 F.3d 1022, 1027 (9th Cir. 2000), amended on denial of reh'g (July 10, 2000); Norse v. Henry Holt & Co., 847 F. Supp. 142, 145 (N.D. Cal. 1994)).)  Thus, Defendant contends that the fact that "Plaintiffs benefit commercially from, or are developing, AI models trained the same way as Midjourney is compelling evidence (if not an admission) that the technology confers substantial public benefits and promotes innovation in the industry." (Id. at 7.)

However, Plaintiffs point out that the fourth fair-use factor makes no mention of public benefits and instead asks about "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4); (see Dkt. 60 at 8). In Google LLC, the Supreme Court considered "the public benefits the copying will likely produce," but only "in helping to determine the likely market effects" of the allegedly infringing conduct. Google LLC, 593 U.S. at 35. The Supreme Court made clear that balancing the public benefits against the losses to copyright owners would not "always [be] relevant to the application of fair use," but the Supreme Court found the balancing to be relevant in that case under the fourth fair-use factor. Id. at 36. And when the Supreme Court analyzed the public benefits of the allegedly infringing conduct, it focused on the consequences of Google's copying, not anything that the plaintiff (Oracle) did in its own business. See id. at 35-36.

The other two cases relied on by Defendant also focus on the public benefits of

13

the allegedly infringing conduct, not the plaintiffs' conduct in their own businesses. For example, in Sony Computer Ent. Am., Inc., the Ninth Circuit focused on the public benefits of the defendant's conduct creating screen shots of Sony's copyrighted games for the defendant's advertising, not on any conduct by Sony (the plaintiff).  See Sony Computer Ent. Am., Inc., 214 F.3d at 1027.  Similarly in Norse, the U.S. District Court for the Northern District of California focused on the public benefits of the defendant's conduct in publishing a biography that copied excerpts from copyrighted letters written by the plaintiff, and not on any conduct by the plaintiff.  See Norse, 847 F. Supp. at 145.

The U.S District Court for the Southern District of New York made this point in both New York Times Co. and In re Open AI, Inc., Copyright Infringement Litig. First, in New York Times Co., the court explained that the Supreme Court's focus in Google LLC was on the defendant's allegedly infringing conduct and that therefore any discovery related to public benefits should "be directed to the Defendant and the public benefits of its copying, not whether nonparties' Gen AI tools (which presumably were developed without copying) serve a general public benefit."  New York Times Co., 757 F. Supp. 3d at 598.  More recently, in In re Open AI, Inc., Copyright Infringement Litig., the court explained that "[t]he public benefit consideration of the fourth fair use factor requires a court to balance the benefit the public will derive if the use is permitted against the personal gain the copyright owner will receive if the use is denied."  In re OpenAI, Inc., Copyright Infringement Litig., 800 F. Supp. 3d at 610 (internal quotation marks omitted and emphasis in original).  The court went on to explain that "[p]rivate monetary benefits to a copyright holder if a challenged use is permitted is, at best, ancillary to the fair use analysis."  Id.  Thus, the court concluded that the plaintiff's use of generative AI was "not probative of [the plaintiff's] claims of market harm or the alleged public benefit of Defendants' LLMs, and thus [was] not relevant to factor four of the fair use analysis under Rule 26."  Id. (footnote omitted).

This Court agrees with the rationale and conclusions from both New York Times Co. and In re Open AI, Inc., Copyright Infringement Litig. Accordingly, the Court concludes that Defendant's discovery requests seeking documents related to Plaintiffs' development, use of, and policies regarding generative AI are not relevant to the public benefits of the allegedly infringing conduct by Defendant in this case.

### 3. Market Harm.

As explained above, the fourth fair-use factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor "focuses on actual or potential market substitution," Andy Warhol Found. for the Visual Arts, Inc., 598 U.S. at 536 n.12, asking whether consumers treat a challenged use "as a market replacement" for a copyrighted work or a market complement that does not impair demand for the original. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 591 (1994). Defendant contends that "Plaintiffs' own adoption and deployment of AI tools is relevant to this inquiry" because it "undermines Plaintiffs' argument that Midjourney's alleged copying . . . of Plaintiffs' works to train AI has had a 'substantially adverse impact' on the market for Plaintiffs' works." (Dkt. 55-1 at 7-8.)

However, the Court concludes that Defendant's discovery requests seeking documents related to Plaintiffs' development, use of, and policies regarding generative AI are not relevant to the fourth factor of the fair-use inquiry for many of the same reasons set forth above with regard to the public benefits of the allegedly infringing use. As explained above, the fourth fair-use factor "requires scrutiny of a defendant's purported use of the copyrighted work(s)" to determine the market effects of such use by balancing the importance of the public benefits the copying will likely produce against the potential loss to the copyright owner. New York Times Co., 757 F. Supp. 3d at 597-98 (emphasis in original); accord In re OpenAI, Inc., Copyright Infringement Litig., 800 F. Supp. 3d at 609-10 ("The fourth fair use factor requires an analysis of the Defendants' use of NYT's copyrighted material—

15

not NYT's use of Defendants' LLMs—and whether Defendants' use impacts the market for NYT's copyrighted works.").

Thus, Plaintiffs' development and use of generative AI is "not probative of [their] claims of market harm." In re OpenAI, Inc., Copyright Infringement Litig., 800 F. Supp. 3d at 610.  Instead, relevant discovery would include the loss to Plaintiffs and how Defendant's challenged use might "kill demand for the original," as well as discovery directed to Defendant concerning the public benefits from the copying.  New York Times Co., 757 F. Supp. 3d at 598.  Indeed, Plaintiffs agree that discovery focused on their losses is relevant and therefore "have already agreed to produce documents sufficient to show their use of generative AI to create consumer-facing image and video outputs featuring the asserted works."  (Dkt. 60 at 10; Dkt. 55-4 at 3, 6, 8, 12-13.)  This evidence is probative of "the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).

In sum, the Court once again agrees with the rationale and conclusions from both New York Times Co. and In re Open AI, Inc., Copyright Infringement Litig., which hold that a plaintiff's use of generative AI is not relevant to whether the defendant's generative AI model qualifies as fair use under the fourth fair-use factor. Accordingly, the Court concludes that Defendant's discovery requests seeking documents related to Plaintiffs' development, use of, and policies regarding generative AI are not relevant to the fourth factor of the fair-use inquiry.

### 4. Industry Custom and Practice.

Defendant next relies on Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't, 447 F.3d 769, 778 (9th Cir. 2006), for the proposition that courts "should bear in mind that fair use is appropriate where a reasonable copyright owner would have consented to the use, i.e., where the custom or public policy at the time would have defined the use as reasonable."  (Dkt. 55-1 at 7 (citing Wall Data Inc., 447 F.3d at 778).)  Plaintiffs correctly point out that this statement from Wall Data Inc. is dicta because the Ninth Circuit ultimately held that the defendant's challenged use was not

fair use as a matter of law.  See Wall Data Inc., 447 F.3d at 778-82; see Exp. Grp. v. Reef Indus., Inc., 54 F.3d 1466, 1472 (9th Cir. 1995) (explaining that statements which are not necessary to the decision are mere *dicta* and "have no binding or precedential impact").  Regardless, the statement from Wall Data Inc. is supported by a citation to the Copyright Act's legislative history discussing fair use.  See Wall Data Inc., 447 F.3d at 778 (citing Subcomm. on Patents, Trademarks & Copyrights of the Sen. Comm. on the Judiciary, 86th Cong., 2d Sess., Study No. 14, Fair Use of Copyrighted Works 15 (Latman) (Comm. Print 1960)).

This Court has identified three district court opinions relying on this statement from Wall Data Inc. to conclude that industry custom may be relevant to fair use. See Cisco Sys. Inc. v. Arista Networks, Inc., 2016 WL 11752975, at *2 (N.D. Cal. Nov. 16, 2016); Oracle Am., Inc. v. Google Inc., 2016 WL 3181206, at *2 (N.D. Cal. June 8, 2016), rev'd and remanded on other grounds sub nom. Oracle Am., Inc. v. Google LLC, 886 F.3d 1179 (Fed. Cir. 2018), rev'd and remanded, 593 U.S. 1 (2021), and vacated in part, 2021 WL 1941874 (Fed. Cir. May 14, 2021), and aff'd sub nom. Oracle Am., Inc. v. Google LLC, 2021 WL 1941874 (Fed. Cir. May 14, 2021); Pearson Educ., Inc. v. Chegg, Inc., 2023 WL 3775317, at *3 (D.N.J. June 2, 2023).  Defendant also points to Tween Brands Inv., LLC v. Bluestar All., LLC, 2016 WL 5216632 (S.D. Ohio Sept. 22, 2016), (Dkt. 55-1 at 7), where the court relied on an overall sense of fairness to conclude that evidence of the plaintiff's conduct could be relevant to the analysis of fair use as demonstrating industry practice.  See Tween Brands Inv., 2016 WL 5216632, at *5 ("Given the plain meaning of the word 'fair,' it would seem unjust for Tween to prevail on a claim when it engages regularly in conduct that would also violate the Copyright Act, or, at minimum, is industry practice.").

Ultimately, this Court looks to the Supreme Court's guidance that the fair use doctrine is "an equitable rule of reason that permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which

17

the law is designed to foster." Google LLC, 593 U.S. at 18 (internal quotation marks omitted). Thus, the Court understands that the four factors listed in the Copyright Act are "not exhaustive," but instead represent "general principles, the application of which requires judicial balancing, depending upon relevant circumstances, including significant changes in technology." Id. at 19 (internal quotation marks omitted). Based on this guidance, the Court concludes that industry custom and practice may be relevant to the analysis of fair use in a particular case.

Defendant contends that "[i]f Plaintiffs, some of the largest, most sophisticated copyright holders in the world, are themselves training generative AI models on third-party copyrighted works, scraping the internet, and investing in tools that do the same, that is powerful evidence that the relevant industry considers such conduct to be fair use." (Dkt. 55-1 at 7.) Plaintiffs counter that "courts consistently reject the argument that 'everybody else is doing it' as a defense to copyright infringement." (Dkt. 60 at 9.) For example, Plaintiffs point to Bellsouth Advert. & Pub. Corp. v. Donnelley Info. Pub., Inc., 719 F. Supp. 1551, 1561 (S.D. Fla. 1988), rev'd on other grounds, 999 F.2d 1436 (11th Cir. 1993), (Dkt. 60 at 9), where the court rejected the defendant's reliance on industry practice as establishing fair use and called the argument "analogous to that of a driver stopped for speeding" who claims that "everybody drives over fifty-five." Bellsouth Advert. & Pub. Corp., 719 F. Supp. at 1561. The court in Bellsouth Advert. & Pub. Corp. went on to state that "[j]ust as widespread abuse of speed limits is irrelevant to the crime of speeding, industrial piracy of directors, even if widespread, should not be probative of whether such piracy is a fair use." Id.

The rationale from Bellsouth Advert. & Pub. Corp. is consistent with the analysis of the U.S. District Court for the Southern District of New York in New York Times Co., where the court rejected the defendant's attempt to turn the case into "a referendum on the benefits of Gen AI, on Plaintiff's business practices, or . . . whether any of Plaintiff's employees use Gen AI at work." New York Times Co.,

18

757 F. Supp. 3d at 599.  The court went on to explain that "[t]he broad scope of document production sought here is simply not relevant to Defendant's purported fair use defense."  Id.  "For example, if a copyright holder sued a video game manufacturer for copyright infringement, the copyright holder might be required to produce documents relating to their interactions with that video game manufacturer, but the video game manufacturer would not be entitled to wide-ranging discovery concerning the copyright holder's employees' gaming history, statements about video games generally, or even their licensing of different content to other video game manufacturers."  Id.

This Court once again finds the rationale and conclusions from New York Times Co. to be highly persuasive and applicable here.  Based on the foregoing analysis, the Court will permit some discovery related to industry custom and practice, but that does not broadly make all activities related to Plaintiffs' development and use of generative AI relevant to Defendant's defense of fair use.  Moreover, Defendant's attempt to show that Plaintiffs engaged in the very conduct they are challenging here is really an attempt to establish the equitable defense of unclean hands, which the Court addresses below.  The Court will address Defendant's specific discovery requests below after analyzing Defendant's arguments related to the defense of unclean hands.

### 5. Unclean Hands.

In addition to fair use, Defendant contends that the discovery requested is relevant to its equitable defense of unclean hands.  (Dkt. 55-1 at 8-9.)  Specifically, Defendant contends that the discovery sought is "essential to Midjourney's unclean hands defense, which requires only that Plaintiffs' conduct (1) is inequitable; and (2) relates to the subject matter of Plaintiffs' claims."  (Id. at 8 (citing POM Wonderful LLC v. Coca-Cola Co., 166 F. Supp. 3d 1085, 1092 (C.D. Cal. 2016)).)  However, the Ninth Circuit has explained that in the context of copyright infringement, the equitable defense of "unclean hands is recognized only rarely, when the plaintiff's

19

transgression is of serious proportions and relates directly to the subject mater of the infringement action." Dream Games of Arizona, Inc. v. PC Onsite, 561 F.3d 983, 990-91 (9th Cir. 2009) (internal quotation marks omitted). "For instance, the defense has been recognized when plaintiff misused the process of the courts by falsifying a court order or evidence, or by misrepresenting the scope of his copyright to the court and opposing party." Id. at 991 (internal quotation marks omitted). The Ninth Circuit further explained that "the alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct." Id. at 990 (internal quotation marks and brackets omitted).

As set forth above, Defendant relies on POM Wonderful LLC for the elements of the defense of unclean hands, (Dkt. 55-1 at 8), but POM Wonderful LLC is a trademark and false advertising case, and did not involve claims under the Copyright Act. See POM Wonderful LLC, 166 F. Supp. 3d at 1088.[3] By contrast, Plaintiffs rely on Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F. Supp. 2d 1197, 1223 (C.D. Cal. 2007), (Dkt. 60 at 11), a copyright case where the court articulated the elements of the defense of unclean hands as follows: "To establish unclean hands, a defendant must demonstrate (1) inequitable conduct by the plaintiff; (2) that the plaintiff's conduct directly relates to the claim which it has asserted against the defendant; and (3) plaintiff's conduct injured the defendant." Metro-Goldwyn-Mayer Studios, Inc., 518 F. Supp. 2d at 1223 (internal quotation marks omitted). The Court notes that the elements identified in Metro-Goldwyn-Mayer Studios, Inc. are more consistent with the Ninth Circuit's guidance in Dream Games of Arizona, Inc. than the two-element test articulated in POM Wonderful LLC.

Defendant also relies on Mattel, Inc. v. MGA Ent., Inc., 2010 WL 11464001,

---

[3] Defendant also relies on In-N-Out Burgers v. Smashburger IP Holder LLC, 2018 WL 7891028, at *5-6 (C.D. Cal. Dec. 21, 2018), (Dkt. 55-1 at 8-9), which is another trademark and false advertising case, and did not involve claims under the Copyright Act. See In-N-Out Burgers, 2018 WL 7891028, at *2.

at *1 (C.D. Cal. Oct. 28, 2010), for the proposition that if Plaintiffs are engaged in the same conduct alleged against Defendant, then "the jury should hear that evidence." (Dkt. 55-1 at 8.) But the rationale in Mattel, Inc. was much narrower than Defendant's represent. In Mattel, Inc., the court concluded that the defendant's discovery "into whether [the plaintiff] engaged in the same conduct it now complaints about: wrongfully obtaining advance information about competitors' forthcoming product lines," was "relevant to [the defendant's] unclean hands defense." Mattel, Inc., 2010 WL 11464001, at *1. Thus, the discovery sought in Mattel, Inc. was focused on conduct by the plaintiff that would have injured the defendant, which is consistent with the elements of the defense of unclean hands set forth in Metro-Goldwyn-Mayer Studios, Inc.

In sum, the Court will apply the elements of the defense of unclean hands set forth in Metro-Goldwyn-Mayer Studios, Inc. and take heed of the Ninth Circuit's guidance that in the context of copyright infringement, the equitable defense of "unclean hands is recognized only rarely." Dream Games of Arizona, Inc., 561 F.3d at 990. Applying the elements of unclean hands from Metro-Goldwyn-Mayer Studios, Inc., the Court concludes that Defendant's discovery requests seeking documents related to Plaintiffs' development, use of, and policies regarding generative AI are not relevant to the defense of unclean hands because none of the discovery would establish inequitable conduct by Plaintiffs that is both directly related to the claims asserted against Defendant and injured Defendant.[4] Now that the Court has analyzed the relevance of Defendant's requested discovery, the Court will turn to address the proportionality of the requests to the needs of the case. See

---

[4] The Court concludes that the discovery at issue in the instant Motion to Compel is not relevant to the defense of unclean hands. But the Court will permit highly focused discovery relevant to the defense of unclean hands that satisfies the elements set forth in Metro-Goldwyn-Mayer Studios, Inc. and heeds the guidance of the Ninth Circuit that the defense of "unclean hands is recognized only rarely" in copyright infringement actions. Dream Games of Arizona, Inc., 561 F.3d at 990.

21

Fed. R. Civ. P. 26(b)(1) (stating that discovery must be both relevant and proportional to the needs of the case).

### 6. Proportionality.

As set forth above, the Court concludes that Defendant's requested discovery is potentially relevant to establishing: (1) the potential market for or value of the copyrighted work; (2) industry custom and practice; and (3) the defense of unclean hands. For both the first group (RFP Nos. 12, 13, 25) and second group (RFP Nos. 8, 10, 23-24) of document requests, Plaintiffs agreed to produce documents sufficient to show their business plans, roadmaps, research reports, other studies, and approvals of their actual or proposed development or training of generative AI intended for consumers, including their contractors' authorized use of generative AI intended for consumers. (Dkt. 55-4 at 3, 6, 12, 13.) Similarly for the third group (RFP Nos. 14, 21), Plaintiffs agreed to produce documents reflecting statements by Plaintiffs' corporate officers concerning the development of generative AI intended for consumers. (Id. at 8.) In addition, Plaintiffs agreed to produce documents sufficient to show the Board of Directors minutes, presentations, or executive-level briefings relating to Midjourney. (Id. at 10.)

Based on the analysis of relevance set forth above, the Court concludes that documents related to Plaintiffs' development, use of, and policies regarding generative AI, as requested in RFP Nos. 8, 12, 14, 21, 23, and 24, are relevant to the extent they establish "the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Therefore, the Court agrees with Plaintiffs' rationale of limiting the scope of responsive documents to the actual or proposed development of generative AI intended for consumers because this addresses the market-harm factor of the fair-use analysis. See New York Times Co., 757 F. Supp. 3d at 598. To the extent RFP Nos. 8, 12, 14, 21, 23, and 24 seek documents related to the actual or proposed development of generative AI not intended for consumers, the requested discovery is not relevant to market harm, and even if there were some marginal relevance, that

marginal relevance would be easily outweighed by the voluminous scope of the requests and therefore the Court concludes that the requests are not proportional to the needs of the case.  See id.; In re OpenAI, Inc., Copyright Infringement Litig., 800 F. Supp. 3d at 610.

However, the Court concludes that Plaintiffs inappropriately limited their response to RFP No. 21 by only agreeing to produce documents sufficient to show the Board of Directors minutes, presentations, or executive-level briefings relating to Midjourney.  (Dkt. 55-4 at 10.)  Consistent with the foregoing analysis, the Court directs Plaintiffs to also produce documents responsive to RFP No. 21 that are sufficient to show Plaintiffs' approval of the use of generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works.  As explained above, documents related to Plaintiffs' development and use of generative AI intended for consumers is relevant to the market-harm factor of the fair-use analysis.  Accordingly, Defendant's Motion to Compel is GRANTED IN PART as to RFP No. 21.

Turning now to Defendant's discovery requests seeking documents related to the training of generative AI tools, including third-party datasets (RFP Nos. 13, 25), the Court concludes that these requests have some relevance to establishing industry custom and practice, but must be narrowed consistent with the discovery responses set forth above to focus on Plaintiffs' actual or proposed development of generative AI intended for consumers.  By focusing these requests on Plaintiffs' training of generative AI intended for consumers, the discovery will provide evidence of the relevant industry customs and practices, which are those customs and practices for generative AI tools like Midjourney, which is intended for consumers.  By contrast, Plaintiffs' training of generative AI tools not intended for consumers would not provide evidence of industry customs and practices that would be relevant to Defendant's defense of fair use.  Alternatively, the Court concludes that even if there were some marginal relevance to Plaintiffs' training of generative AI tools not

23

intended for consumers, that marginal relevance would be easily outweighed by the voluminous scope of the requests and therefore the Court concludes that the requests are not proportional to the needs of the case.  See New York Times Co., 757 F. Supp. 3d at 598; In re OpenAI, Inc., Copyright Infringement Litig., 800 F. Supp. 3d at 610.

Accordingly, Defendant's Motion to Compel is GRANTED IN PART as to RFP No. 13.  Specifically, the Court directs Plaintiffs to produce non-privileged responsive documents sufficient to show Plaintiffs' development, training, or contemplated development or training of any generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works, including training datasets, datasources, or model weights.[5]  In light of the direction to produce the foregoing responsive documents for RFP No. 13, the Court concludes that RFP No. 25 is duplicative and not proportional to the needs of the case.  For example, RFP No. 25 seeks all documents concerning any third-party datasets, as opposed to documents sufficient to show.  (Dkt. 55-4 at 13.)  And Plaintiffs will be producing documents sufficient to show the dataset, datasources, or model weights used in their development or training of generative AI intended for consumers in response to RFP No. 13.  Accordingly, the Court DENIES IN PART Defendant's Motion to Compel as to RFP No. 25.

The Court next turns to RFP No. 10, which seeks documents sufficient to show any generative AI tool tested or evaluated by Plaintiffs for use by Plaintiffs' employees or contractors, including, but not limited to, vendor contracts, NDAs, statements of work, or research reports or analyses.  (Dkt. 55-4 at 4-5.)  For the same reasons set forth above, the Court concludes that this request is only relevant to the extent it seeks documents related to Plaintiffs' actual or proposed development of generative AI intended for consumers.  However, those documents are already

---

[5] The Court notes that these documents will likely overlap with the documents Plaintiffs already agreed to produce in response to RFP No. 12.

24

covered by the prior discovery requests set forth above and therefore RFP No. 10 is duplicative, overbroad, and not proportional to the needs of the case. Accordingly, the Court DENIES IN PART Defendant's Motion to Compel as to RFP No. 10. The Court now turns to Defendant's final discovery request at issue, RFP No. 16.

**B.      Plaintiffs' Prompts and Outputs to and from Midjourney (RFP No. 16):**

Defendant's final discovery request at issue is RFP No. 16, which seeks to identify the prompts used to create the purported Midjourney images shown in the operative complaints, and all other prompts submitted by Plaintiffs to Midjourney in connection with attempts to generate each image shown in the operative complaints, including prompts that resulted in images not shown in the operative complaints, and all outputs generated in response to such prompts. (Dkt. 55-4 at 8-9.) Plaintiffs agreed to produce documents sufficient to identify the prompts used to create the images generated by Midjourney shown in the operative complaints and put at issue in this action, as well as the side-by-side outputs contemporaneously generated in response to such prompts. (Id. at 9.) Thus, the dispute here is focused on the prompts and outputs for images generated by Plaintiffs in connection with attempts to generate images for the operative complaints, but where Plaintiffs did not ultimately use the image.

Defendant contends that withholding prompts and outputs related to images not used in the operative complaints would allow Plaintiffs to artificially inflate the universe of allegedly infringing outputs, distort the damages calculus, or misrepresent their own engineered images as examples of third-party infringement. (Dkt. 55-1 at 9.) However, Plaintiffs point out that the volume of prompts and outputs related to images generated for potential use in the operative complaints, but not actually used, is infinitesimal compared to the true scope of this case which involves tens of millions of subscriber prompts associated with Plaintiffs' copyrighted works. (Dkt. 60 at 13 (citing Defendant's document production at MID01_DSNEY_00000001).) The Court also rejects the notion that withholding

prompts and outputs related to images that were generated for, but not used in, the operative complaints could somehow distort the damages calculus in light of the current statistical sampling protocol that the parties are finalizing.  (Dkt. 76 at 2.) The current sampling protocol, based on what the parties have advised the Court, would allow for Defendant to identify any prompt that was generated by Plaintiffs. Thus, the Court rejects Defendant's argument on relevance.

Moreover, the Court also easily concludes that prompts and outputs associated with images generated for, but not used in, the operative complaints qualifies for protection under the work-product doctrine.  The work-product doctrine protects "from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation."  Admiral Ins. Co. v. U.S. Dist. Ct., 881 F.2d 1486, 1494 (9th Cir.1989) (citing Fed. R. Civ. P. 26(b)(3)).  The Advisory Committee Notes to Rule 26 indicate that the drafters intended to provide work-product protection for documents created by parties and their representatives who are non-attorneys as well as their attorneys.  See Fed. R. Civ. P. 26(b)(3) Advisory Committee's Notes (1970) ("Subdivision (b)(3) reflects the trend of the cases by requiring a special showing, not merely as to materials prepared by an attorney, but also as to materials prepared in anticipation of litigation or preparation for trial by or for a party or any representative acting on his behalf. The subdivision then goes on to protect against disclosure the mental impressions, conclusions, opinions, or legal theories concerning the litigation of an attorney or other representative of a party." (emphasis added)).  To qualify for work-product protection, documents must: (1) be "prepared in anticipation of litigation or for trial" and (2) be prepared "by or for another party or by or for that other party's representative."  In re Grand Jury Subpoena, Mark Torf/Torf Envtl. Mgmt. (Torf), 357 F.3d 900, 907 (2004) (internal quotation marks omitted).

Defendant's RFP No. 16 literally seeks prompts and outputs submitted "in connection with attempts to generate each image shown in the [operative

complaints]." (Dkt. 55-4 at 8.)  This is classic work product because it represents Plaintiff's pre-suit investigation and efforts to prepare the operative complaints.  See, e.g., Concord Music Group, Inc. v. Anthropic PBC, 2025 WL 1482734, at *2 (N.D. Cal. May 23, 2025) (holding that undisclosed prompts and outputs from plaintiff's pre-suit investigation in copyright infringement action were protected by the work-product doctrine); Tremblay v. OpenAI, Inc., 2024 WL 3748003, at *2 (N.D. Cal. Aug. 8, 2024) (same).  Moreover, the Court concludes that prompts and outputs associated with images generated for, but not used in, the operative complaints constitute "core" work product because they necessarily reveal counsel's "mental impressions, conclusions, opinions, or legal theories developed in anticipation of litigation."  Republic of Ecuador v. Mackay, 742 F.3d 860, 869 n.3 (9th Cir. 2014). Indeed, the choice of which images to feature in the operative complaints is obviously strategic and reflects the mental impressions, conclusions, opinions, and legal theories of counsel.  See, e.g., U.S. ex rel. Bagley v. TRW, Inc., 212 F.R.D. 554, 563 (C.D. Cal. 2003) ("Where the selection, organization, and characterization of facts reveals the theories, opinions, or mental impressions of a party or the party's representative, that material qualifies as opinion work product.").  The Ninth Circuit has explained that opinion work product "is virtually undiscoverable."  Republic of Ecuador, 742 F.3d at 869 n.3 (internal quotation marks omitted).

Defendant appears to recognize that RFP No. 16 clearly seeks documents and information protected by the work-product doctrine and therefore argues that Plaintiffs waived any work-product protection. (Dkt. 55-1 at 9-11.)  First, Defendant contends that Plaintiffs waived protection of the work-product doctrine by submitting prompts to Midjourney in the first place because Midjourney's Terms of Service make prompts and outputs public by default and grant Midjourney a license to reproduce, prepare derivative works of, publicly display, publicly perform, sublicense, and distribute their inputs.  (Id. at 10.)  However, courts have recognized that "waiver of attorney work-product protection requires more than the disclosure of

27

confidential information, it requires an act inconsistent with the adversary system." Great Am. Assur. Co. v. Liberty Surplus Ins. Corp., 669 F. Supp. 2d 1084, 1092 (N.D. Cal. 2009); see In re Sealed Case, 676 F.2d 793, 818 (D.C. Cir. 1982) ("The purposes of the work product privilege are more complex, and they are not inconsistent with selective disclosure-even in some circumstances to an adversary.").

Here, Plaintiffs' pre-suit investigation that included submitting prompts to Midjourney was not inconsistent with the adversary system or the purposes of the work-product doctrine. See Republic of Ecuador, 742 F.3d at 867 ("The work product doctrine is a qualified immunity from discovery that attempts to balance the necessity of protecting an attorney's preparation under the adversary system, and the policy of full and open discovery underlying the rules." (internal quotation marks omitted)). Thus, the Court rejects the notion that merely submitting prompts to Midjourney as part of preparing the operative complaints affected a waiver of the work-product doctrine. See Tremblay, 2024 WL 3748003, at *3 ("Thus, it was improper to extend the scope of the waiver to opinion work product not disclosed in the operative complaint."). The Court recognizes that Defendant has custody of these prompts and outputs, and nothing is stopping Defendant from conducting its own investigation of prompts submitted by Plaintiffs and their counsel, but the Court concludes that the work-product doctrine protects Plaintiffs from being required to respond to discovery which would essentially draw a roadmap as to counsel's strategic choices in selecting images for the operative complaints. This conclusion is supported by the Court's finding that the discovery in question qualifies as opinion work product, as well as Federal Rule of Civil Procedure 26(b)(3)(B) which states that if a court orders discovery of documents and tangible things prepared in anticipation of litigation, "it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." The Court concludes that there is no way to compel the production of the prompts and outputs associated with images

28

generated for, but not used in, the operative complaints while still protecting against the disclosure of the mental impressions, conclusions, opinions, and legal theories of Plaintiffs' counsel, as required by Rule 26(b)(3)(B).

Defendant next contends that Plaintiffs waived protection under Federal Rule of Evidence 502(a) through selective disclosure.  (Id.)  Specifically, Defendant argues that "Plaintiffs intentionally featured curated subset of prompts and outputs in their Complaints" and "fairness requires that Midjourney be able to evaluate whether outputs Plaintiffs proffer as evidence of infringement were in fact created by them." (Dkt. 55-1 at 9.)  However, Plaintiffs have already agreed to produce documents sufficient to identify the prompts used to create the images shown in the operative complaints, so there is no fairness issue as to whether evidence proffered by Plaintiffs was created by them.  (Dkt. 55-4 at 9.)  Moreover, the fact that Plaintiffs featured a curated subset of prompts and outputs in their operative complaints does not constitute a selective disclosure of attorney work product under Rule 502(a). Accepting Defendant's view of selective disclosure would virtually eliminate the protection for attorney work product in the context of any court filing because every court filing inherently reflects strategic choices of counsel in what facts to include and even what legal arguments to make.  This alone cannot be deemed selective disclosure and is clearly inconsistent with Rule 26(b)(3); see Tremblay, 2024 WL 3748003, at *3 (holding that waiver of the work-product doctrine requires a showing that counsel's mental impressions have been put at issue and there is a compelling need for the material).

Finally, Defendant contends that Plaintiffs waived protection by naming an evidence collector, Bruce Ward, as an individual likely to have discoverable information regarding infringing outputs that they are relying on in this action.  (Dkt. 55-1 at 11.)  Defendant contends that since Plaintiffs put Mr. Ward's investigation at issue, Plaintiffs cannot withhold the full record of what he (and those helping him) found.  (Id.)  However, Plaintiffs point out that Mr. Ward was identified as a mere

fact witness about the non-privileged prompts and outputs that were used in the operative complaints.  (Dkt. 60 at 15.)  The Court easily concludes that the mere fact that Plaintiffs have identified Mr. Ward as a witness with discoverable information regarding infringing outputs does not somehow put his entire investigation at issue and waive the work-product protection as to all prompts he submitted to Midjourney.

In sum, the Court concludes that the prompts and outputs associated with images generated for, but not used in, the operative complaints are protected from disclosure by the attorney work-product doctrine.  The Court further concludes that these prompts and outputs qualify as core opinion work product.  Defendant has failed to establish either waiver or that the mental impressions of counsel are at issue in this case and that there is a compelling need for the material.  See, e.g., United States v. Sanmina Corp., 968 F.3d 1107, 1125 (9th Cir. 2020) ("We have held that such opinion work product is discoverable only when mental impressions are at issue in a case and the need for the material is compelling." (internal quotation marks omitted)).  Thus, the Court DENIES Defendant's Motion to Compel as to RFP No. 16.

## V.

## CONCLUSION

Consistent with the foregoing, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion to Compel.  (Dkt. 55.)  Specifically, the Court GRANTS IN PART Defendant's Motion to Compel by directing Plaintiffs to provide the following further discovery:

- **RFP No. 21:**  In addition to the documents Plaintiffs already agreed to produce, Plaintiffs shall produce responsive documents that are sufficient to show Plaintiffs' approval of the use of generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works.
- **RFP No. 13:**  Plaintiffs shall produce non-privileged responsive documents

sufficient to show Plaintiffs' development, training, or contemplated development or training of any generative AI to generate images and/or video outputs intended for consumers, featuring the asserted works, including training datasets, datasources, or model weights.

The Court otherwise DENIES Defendant's Motion to Compel.

Finally, Rule 37 states that if a motion to compel is granted in part and denied in part, the court "may, after giving an opportunity to be heard, apportion the reasonable expenses of the motion."  Fed. R. Civ. Proc. 37(a)(5)(C) (emphasis added).  Here, the Court has granted Defendant's Motion to Compel in part and denied the motion in part.  Therefore, the Court exercises its discretion to decline to require expense reimbursement from either side.  See, e.g., Shijiazhuang Hongray Grp. v. World Trading 23, Inc., 2022 WL 17363907, at *4 (C.D. Cal. Nov. 15, 2022) ("[B]ecause the motion was granted in part and denied in part, subsection 37(a)(5)(C) applies and any potential award was discretionary.").

IT IS SO ORDERED.

DATED:  June 15, 2026

_____
HON. A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE

31