# EXHIBIT 1

**REDACTED DOCUMENT
FILED UNDER SEAL**

COOLEY LLP
BOBBY GHAJAR (198719)
(bghajar@cooley.com)
1333 2nd Street, Suite 400
Santa Monica, CA 90401-4100
Telephone:   (310) 883-6400
Facsimile:    (310) 883-6500

JOHN PAUL OLEKSIUK (283396)
(jpo@cooley.com)
STEPHANIE SCHUYLER (PRO HAC VICE)
(sschuyler@cooley.com)
55 Hudson Yards
New York, NY 10001-2157
Telephone:   (212) 479-6000
Facsimile:    (212) 479-6275

JUDD D. LAUTER (290945)
jlauter@cooley.com
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone:   (415) 693-2000
Facsimile:    (415) 693-2222

*Counsel for Defendant Midjourney, Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DISNEY ENTERPRISES, INC., et al.; WARNER BROS. ENTERTAINMENT, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> MIDJOURNEY, INC., a Delaware corporation, <br><br> Defendant. | Case No. 2:25-cv-05275-JAK-AJR <br><br> Consolidated for all purposes with Case No. 2:25-cv-08376-JAK-E <br><br> **DEFENDANT MIDJOURNEY'S OPPOSITION TO MOTION TO COMPEL** <br><br> Judge:    Hon. A. Joel Richlin <br><br> Date Action Filed:  June 11, 2025 |

**REDACTED DOCUMENT
  FILED UNDER SEAL**

COOLEY LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................... 1

II.     BACKGROUND ........................................................................................... 2

III.    LEGAL STANDARD .................................................................................... 3

IV.     ARGUMENT ................................................................................................. 4

    A.      The Midjourney Code Contains Trade Secrets ..................................... 4

    B.      Plaintiffs Have Not Established Relevance or Necessity .................... 5

        1.      The Midjourney Code Has Limited, if Any, Relevance to Material Issues in Dispute ....................................................... 5

        2.      Other Produced Materials Will Provide the Information Plaintiffs Seek ..................................................................... 8

        3.      The Protective Order is Insufficient to Address Potential Harm. ......................................................................... 9

V.      CONCLUSION ........................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*App Press LLC v. Apress Media LLC,*
  2013 WL 12284506 (S.D. Ind. July 19, 2013) ......................................................9

*Congoo LLC v. Revcontent LLC,*
  2017 WL 3584205 (D.N.J. Aug. 10, 2017) .............................................................9

*DIRECTV, Inc. v. Trone,*
  209 F.R.D. 455 (C.D. Cal. 2002) ..........................................................................4

*Disney Enters., Inc. v. Hotfile Corp.,*
  2011 WL 13100240 (S.D. Fla. Aug. 26, 2011) ..................................................4, 9

*Federal Open Mkt. Comm. Of the Fed. Rsrs. Sys. v. Merrill,*
  443 U.S. 340 (1979) ..............................................................................................3

*Hartley Pen Co. v. U.S. Dist. Ct.,*
  287 F.2d 324 (9th Cir. 1961) ........................................................................passim

*NetCurrents Info. Servs., Inc. v. Dow Jones & Co.,*
  2008 WL 11338879 (C.D. Cal. June 11, 2008) .....................................................9

*ODS Techs., L.P. v. Magna Ent. Corp.,*
  2008 WL 11343035 (C.D. Cal. Oct. 24, 2008) ...............................................3, 4, 5

*Realtime Data, LLC v. MetroPCS Tex., LLC,*
  2012 WL 1905080 (S.D. Cal. May 25, 2012) ........................................................9

*Rodriguez Barcenas v. Ford Motor Co.,*
  2005 WL 8162028 (N.D. Cal. Feb. 28, 2005) ........................................................5

*Saleh v. Nike, Inc.,*
  2021 WL 4434352 (C.D. Cal. Aug. 16, 2021) ....................................................3, 8

*Synopsys v. ATopTech, Inc.,*
  2015 WL 1197705 (N.D. Cal. Mar. 16, 2015) .......................................................8

*Synopsys, Inc. v. Nassda Corp.,*
  2002 WL 32749138 (N.D. Cal. Sep. 16, 2002) ......................................................4

COOLEY LLP
ATTORNEYS AT LAW

-ii-

**MIDJOURNEY'S OPPOSITION TO
MOTION TO COMPEL
CASE NO.: 2:25-CV-05275-JAK-AJR**

## TABLE OF AUTHORITIES
### continued

**Page(s)**

*Thales Visionix, Inc. v. United States*,
149 Fed. Cl. 38 (2020)..................................................................................................4

*Viacom Int'l Inc. v. Youtube Inc.*,
253 F.R.D. 256 (S.D.N.Y. 2008)...................................................................................9

*Young v. Salesforce*,
2025 WL 1800149 (N.D. Cal. June 30, 2025) ...........................................................4

**Statutes**

Cal. Civil Code § 3426.1(d)...........................................................................................5

**Other Authorities**

Fed. R. Civ. P.
26 ...................................................................................................................................1
26(b)(1).........................................................................................................................3
26(b)(2)(C)................................................................................................................1, 3

## I.    INTRODUCTION

At issue in this Motion is commercially sensitive source code related to training Midjourney v8, the company's most recent model, released just a few months ago; and a code repository titled "torch-aesthetic-redux," ████████████ ████████████████████████████████████████ (collectively, the "Midjourney Code"[1]).

As Plaintiffs and their expert, Dr. Jonathan Krein, tell the story, this code is critical to their case: it is supposedly the "blueprint," the "Rosetta Stone," and the "script of the play"; it is *the* thing that will identify the specific images that Midjourney used to train v8, how often those images were used during training runs, which "expressive features" of training data were purportedly "captured" during training, and both whether and why Midjourney selected for those features.  But as explained below and by Midjourney's expert, Dr. Trevor Darrell, the at-issue source code does not and cannot answer any of these questions.

Plaintiffs are engaged in forensic theater.  More source code may project thoroughness and satisfy the curiosity of Plaintiffs' experts, but that is not a sufficient basis to compel its production.  The information Plaintiffs say they need, to the extent it exists, can be obtained—and much of it must be obtained—through less intrusive discovery: training data, configuration files, logs, technical descriptions, and/or testimony.

Rule 26 requires the Court to limit discovery where the same information is available from a source that is "more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C).  In the Ninth Circuit, this rule has particular force where, as here, disclosure of highly sensitive trade secrets would expose a party

---

[1] For purposes of this Motion, Midjourney distinguishes on the one hand between configuration files within v8 training code that, arguably, may contain relevant information ████████████████████████████ and which Midjourney has agreed to produce; and on the other hand, "core" source code that does not contain such information and which Midjourney opposes production of. *See* Darrell ¶ 16.  The "Midjourney Code" concerns only the latter.

to risk of significant competitive harm.   Plaintiffs must demonstrate that the Midjourney Code is both relevant and *necessary* – a showing they cannot make.

## II.   BACKGROUND

Plaintiffs' copyright claims rest on allegations that Midjourney created copies of still images and video clips from Plaintiffs' films and television series to train its models, and that Midjourney's service enables users to generate images and short clips depicting their purported characters. *See e.g.*, Dkt. 1 ¶¶ 204, 216-17.  Plaintiffs do not allege that Midjourney copied their code, or that any Midjourney code infringes code owned by Plaintiffs. *See id*.

Nevertheless, since the outset of discovery, Plaintiffs have sought broad source code disclosure. Lauter ¶ 2, Ex. A.  Though Midjourney initially objected on relevance and proportionality grounds, on March 31, 2026 it produced training data processing, content moderation, and model training code through v7, and will soon provide code for its video model, certain other codebases, and training logs, with training data inspection conditions currently under negotiation. *Id*. ¶ 3; *see* Dkt. 93.

Plaintiffs remain unsatisfied. Recently, they demanded "all source code" for the Midjourney "Explore Page," "Midjourney TV," and prompt-processing functions.  Lauter ¶ 4, Ex B.  And they have served over 100 requests targeting other technical documents and internal communications. *Id*. Exs. A-B.¶¶ 4–5, Ex. B. Meanwhile, Midjourney has produced over 4,000 documents, including internal communications concerning data selection and processing decisions and model development. *Id*. ¶ 6.  Midjourney is mid-review of tens of thousands of additional documents and will be producing substantive productions in the coming weeks. *Id*.

Plaintiffs offer various reasons why they are entitled to v8 training code and the torch-aesthetic-redux codebase (or code for an associated scoring model). *See generally*, Mot.  To the extent that the information sought by Plaintiffs even exists or can be reasonably determined, however, other discovery that Midjourney is prepared to provide addresses their stated needs:

COOLEY LLP
ATTORNEYS AT LAW

2

| Claimed Need | V8 training code | torch-aesthetic-redux *and/or* scoring model code |
|---|---|---|
| *Identification of specific images selected for use in training.* Mot. at 4. | v8 training data (or sample thereof) | Scoring-model training data (or sample thereof) |
| *How often particular datasets were used.* Id. | Training logs | n/a |
| ██████████ | ████████████ | |
| *How the scoring model works / what it selects for.* Id. | n/a | Scoring-model training data; explanation of scoring logic / metric |
| *How filters were applied during training.* Id. | v8 training config files w/filter thresholds / other filter logic; testimony or written explanation of differences from earlier models | |

## III.   LEGAL STANDARD

Discovery is limited to that which is "proportional to the needs of the case," and courts "must limit" discovery that "can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(1) and (b)(2)(C).  Under this standard, "disclosure of trade secrets will be required *only* where such disclosure is *relevant* and *necessary* to the prosecution or defense of a particular case."[2] *Hartley Pen Co. v. U.S. Dist. Ct.*, 287 F.2d 324, 330 (9th Cir. 1961) (emphasis added); *see also Federal Open Mkt. Comm. Of the Fed. Rsrs. Sys. v. Merrill,* 443 U.S. 340, 362 (1979) (courts weight trade secrets' privacy interest against need for disclosure) (citation omitted).  Courts routinely deny disclosure of source code on this basis.  *See e.g., Saleh v. Nike, Inc.*, 2021 WL 4434352, at *1 (C.D. Cal. Aug. 16, 2021) (denying motion to compel; plaintiff failed to show source code was "both relevant and necessary"); *ODS Techs., L.P. v. Magna Ent. Corp.,*

---

[2] During a May 22 informal discovery conference, on a less developed record without the benefit of full briefing, the Court questioned the applicability of a "necessity" standard for motions to compel production of source code.  *See* May 22, 2026 IDC Tr. at 57:8-23.  As demonstrated here, the Ninth Circuit has applied the necessity standard to trade secrets; that standard is binding and applicable to the Motion.

COOLEY LLP
ATTORNEYS AT LAW

MIDJOURNEY'S OPPOSITION TO MOTION TO COMPEL
CASE NO.: 2:25-CV-05275-JAK-AJR

2008 WL 11343035, at *1-2 (C.D. Cal. Oct. 24, 2008) (denying motion to compel; reiterating trade secrets must be both "relevant" and "necessary"); *DIRECTV, Inc. v. Trone*, 209 F.R.D. 455, 459-60 (C.D. Cal. 2002) (similar); *Young v. Salesforce*, 2025 WL 1800149, at *2 (N.D. Cal. June 30, 2025) (denying production of source code as disproportionate) (citing cases); *Disney Enters., Inc. v. Hotfile Corp.*, 2011 WL 13100240, at *2 (S.D. Fla. Aug. 26, 2011) (denying motion where plaintiff failed to show need for source code when program could be described by other means).

## IV.    ARGUMENT

Under Ninth Circuit law, Plaintiffs bear the burden of demonstrating that the trade secrets they seek are "both relevant and necessary to the action," *Synopsys, Inc. v. Nassda Corp.*, 2002 WL 32749138, at *1 (N.D. Cal. Sep. 16, 2002).[3]  They have not met, and cannot meet, that burden here.  The Court should deny the motion.

### A.    The Midjourney Code Contains Trade Secrets

"It is common knowledge that a computer program's source code is a trade secret."  *ODS Techs.*, 2008 WL 11343035, at *1 (citing *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992) *cert. denied*, 513 U.S. 1044 (1994)).  Plaintiffs do not dispute this fact.  As detailed by Midjourney's founder and CEO, David Holz, the trade secrets embodied in the Midjourney Code are extraordinarily sensitive, concerning ███████████████████████████ ████████████████████ not germane to this case.  Holz ¶ 9.  Disclosure – even under strict access controls – would enable a reviewer to replicate years of Midjourney's research and engineering, severely compromising its competitive position and threatening its business.  *Id*. ¶ 10-12.  The Midjourney Code thus squarely qualifies as a "trade secret" under Ninth Circuit authority.  *See ODS Techs.*,

---

[3] Plaintiffs' only cited authority for the proposition that "there is no elevated standard when seeking the discovery of source code" is an inapposite decision from the Court of Federal Claims. *Thales Visionix, Inc. v. United States*, 149 Fed. Cl. 38, 48 (2020). The weight of authority, including Midjourney's cited Ninth Circuit precedent, does not share the *Thales* court's interpretation of proportionality under the Federal Rules. *See Hartley*, 287 F.2d at 328.

2008 WL 11343035, at *1; *see also* Cal. Civil Code § 3426.1(d) (defining trade secret as including a "program, . . . method, technique, or process").

### B.    Plaintiffs Have Not Established Relevance or Necessity

Because the Midjourney Code is a trade secret, Plaintiffs must establish that disclosure is both relevant and necessary. *ODS Techs.*, 2008 WL 11343035, at *2. "The level of necessity that must be shown is that the information must be necessary for the [Plaintiffs] to prepare [their] case for trial, which includes proving [their] theories and rebutting [their] opponent's theories." *Rodriguez Barcenas v. Ford Motor Co.*, 2005 WL 8162028, at *4 (N.D. Cal. Feb. 28, 2005) (citation omitted).

### 1.    The Midjourney Code Has Limited, if Any, Relevance to Material Issues in Dispute

Plaintiffs cloak their aggressive demands in a misleading analogy: that Midjourney Code is a kind of "blueprint" (Mot. at 1) that describes "how" Midjourney used their works. *Id*. In their telling, the code lays bare which specific images were used during training, how often, the reasoning behind why each image was selected and prioritized, and the expressive elements of their asserted works that Midjourney may have selected for and (purportedly) encoded in its models. *Id*. at 4. If so much of their case could be resolved by the Midjourney Code, it begs the question why Plaintiffs served over 100 document requests directed at Midjourney's internal communications and other non-source code documents. Lauter ¶¶ 5-6. The reality is far more modest than what Plaintiffs assert: the at-issue "source code may describe the procedural mechanisms by which training data is loaded, processed, filtered, or otherwise handled during training, but" it will not "provide insight into training data contents or how training data influences user outputs." Darrell ¶ 25.

**v8 Training Code:** Plaintiffs claim that only v8 training code will show "whether, how often, and how heavily" particular images were used in training; whether Midjourney's pipeline was "specifically configured to score, select, or up-weight Plaintiffs' copyrighted content"; and whether training caused the

"encod[ing]" or "preserv[ation]" of expressive content in the resulting model.  Mot. at 4 (citing Krein ¶¶ 11, 14, 20, 26).  Dr. Darrell – a co-founder of UC Berkeley's AI lab and one of the world's foremost experts in computer vision and deep learning – explains why each of these claims is wrong.

***First***, training source code does not identify the specific contents of training data.  As a general matter, source code and other technical documentation like training logs do not contain training images, image descriptions, or image file names.  As Dr. Darrell explains, "[t]he training data used to train the model are distinct from the training source code, as the training data are the inputs to the training process."  Darrell ¶ 21.  Because training code is designed to operate across different datasets, it does not even necessarily reflect what datasets were used in training.  *Id*.  Contrary to Dr. Krein's claim that source code, configurations, and logs can triangulate which *specific* works were used during training and how often (Krein ¶¶ 14, 20; Mot. at 4), these materials will, at best, "provide information at the level of a dataset of many images, and will not provide information about individual images."  Darrell ¶¶ 21-29, 32, 37.  What is in a training dataset can only be determined by the dataset itself.

***Second***, and for the same reasons, source code does not reveal which images were "favored" or "preferred" during training. *Id*. ¶¶ 27-29.  Configuration files and training logs might show the filters and weighting decisions at the dataset level, but those can be produced or described without disclosure of the underlying code.

***Third***, training code will not show what Midjourney's models have "learned." As Dr. Darrell explains, "[i]t is well understood in the field of machine learning that the appropriate way to assess what a model has 'learned' from its training data is through examination of the model's behavior and outputs, rather than inspection of the training source code itself." *Id*. ¶¶ 30-31, 38.

For these reasons, Plaintiffs' assertion that v8 training code is "central" to their case thus falls flat.  To the extent that *how* Midjourney trained v8 is relevant to volitional conduct, willfulness, or fair use (Mot. at 4-5)—legal positions Midjourney

strongly disputes[4]—Plaintiffs have not shown that the Midjourney Code, as opposed to other technical documents and information, and/or testimony, is *necessary* for any of those purposes.

**torch-aesthetic-redux**: The torch-aesthetic-redux codebase is equally irrelevant. Contrary to Plaintiffs' characterization, it is not ███████████████ ████████████████████████████████████████████ Holz ¶ 9. In any event, neither the code for torch-aesthetic-redux nor a scoring model ███████ ████████ will show what Plaintiffs claim to need. For example, the code will not show "which images were selected" for training. Mot. at 9. Plaintiff's own expert undermines this assertion: Dr. Krein (correctly) characterizes the training data "filter" (*i.e.*, the mechanism that filters out training data based on scores) as "downstream" of training data scoring (Krein ¶ 24(iii)). Moreover, he acknowledges that Midjourney has produced the materials that determine how scores are applied, i.e., the thing that Plaintiffs say they want. *Id.* ¶ 37.

The code also will not show "which of Plaintiffs' copyrighted character images were retained and how heavily they were weighted," "whether Midjourney's scoring favors image characteristics predominant in Plaintiffs' asserted works," or "whether a scoring model was itself trained on Plaintiffs' characters." Mot at 9-10. As Dr. Darrell explains, the preference a scoring model may have for particular visual characteristics, if any, would be fully observable through that model's training data, the per-image scores, and a general understanding of the scoring metric – none of which requires disclosure of the underlying source code. Darrell ¶¶ 33-36, 39 ("If the scoring model associated with torch-aesthetic-redux were designed to favor characteristics associated with Plaintiffs' works, I would expect that preference to be

---

[4] Midjourney reserves its substantive objections to Plaintiffs' legal positions to avoid unnecessary digression. Even if Plaintiffs were correct about the law (they are not), other materials adequately address their stated concerns. More telling: Plaintiffs filed their original complaints and alleged volitional conduct, willfulness, and lack of fair use months before v8 was announced. They cannot credibly claim now that v8 training code is indispensable to theories they were supposedly prepared to prove before it existed.

evident in materials available for review"). Plaintiffs will have relevant internal Midjourney communications and other documents, as well as scores and the training data to run whatever analysis they wish.

As for understanding what the scores *mean* (i.e., what the scoring model scores for) is a question for an interrogatory or deposition, or can be addressed through additional materials Midjourney is prepared to produce, as detailed below. Producing Midjourney's highly sensitive source code to Plaintiffs' growing list of "experts" is not the answer to a question that may be answered far more simply.

### 2. Other Produced Materials Will Provide the Information Plaintiffs Seek

Even if the Court finds some portion of the Midjourney Code relevant, Plaintiffs must independently demonstrate necessity. *Hartley*, 287 F.2d at 328. They cannot. As shown above, the code will not reveal which images were included in training runs, which, if any, were favored or preferentially weighted during training, how many times particular works were copied through training iterations, what expressive features of Plaintiffs' works were purportedly "encoded" in the resulting model, or whether Midjourney's pipeline was specifically configured to score, select, or up-weight Plaintiffs' content. *See supra* at 4-7. All of that information, if it exists, is available through training data, configuration files, and logs – all of which Midjourney is prepared to produce. Midjourney will *also* produce the training data used to train the "scoring model" and information sufficient to show the scoring metric applied – in short, everything that will "give meaning to the scores themselves." Mot. at 9. There is simply no need for the source code.

Courts routinely deny requests for source code where, as here, less burdensome alternatives exist. *See, e.g.*, *Saleh*, 2021 WL 4434352, at *2 ("not only must" source code discovery "be relevant and necessary to the prosecution or defense of the case but when alternatives are available, a court will not be justified in ordering disclosure.") (citation omitted); *Synopsys v. ATopTech, Inc.*, 2015 WL 1197705, at

*4 (N.D. Cal. Mar. 16, 2015) (denying motion to compel code production, explaining "production of source code would be duplicative of discovery [plaintiff] already possesses or will shortly possess, and the risk to [defendant] resulting from the exposure of its valuable proprietary information is significant"); *Realtime Data, LLC v. MetroPCS Tex., LLC*, 2012 WL 1905080, at *3 (S.D. Cal. May 25, 2012) (denying motion to compel source code; deposition of a knowledgeable engineer sufficient); *Viacom Int'l Inc. v. Youtube Inc.*, 253 F.R.D. 256, 260-61 (S.D.N.Y. 2008) (similar); *Hotfile Corp.*, 2011 WL 13100240, at *2 (explaining that "it is possible to describe a computer program" without "handing over the code that contains [defendant's] entire business") (citation omitted); *Congoo LLC v. Revcontent LLC*, 2017 WL 3584205, at *3 (D.N.J. Aug. 10, 2017) (denying motion in view of alternatives).

At a minimum, the Motion should be denied without prejudice. Given the extraordinary sensitivity of the Midjourney Code, Plaintiffs should first be required to examine other materials following the parties' forthcoming substantial completion deadline and take relevant depositions. If Plaintiffs still believe Midjourney Code is necessary after doing so, they may renew their request on a more developed record. *See, e.g.*, *NetCurrents Info. Servs., Inc. v. Dow Jones & Co.*, 2008 WL 11338879, at *5 (C.D. Cal. June 11, 2008) (denying request for source code "at this stage," and instructing plaintiff that it may renew its request after "first examin[ing] and evaluat[ing] the other documents and determin[ing] whether such documents satisfy its needs"); *App Press LLC v. Apress Media LLC*, 2013 WL 12284506, at *2 (S.D. Ind. July 19, 2013) (similar).

### 3. The Protective Order is Insufficient to Address Potential Harm.

Plaintiffs contend that the Protective Order (Dkt. 46) already entered in this case adequately addresses Midjourney's concerns, with Dr. Krein characterizing it as "among the most restrictive" he has ever encountered. Mot. at 8 (quoting Krein ¶

44).[5] That misses the point. The risk is not whether the Protective Order is well drafted, it is whether the harm associated with any unauthorized disclosure of these trade secrets can be undone. It cannot. *See* Holz ¶¶ 10-12. As the Ninth Circuit recognized in *Hartley*, "[t]he property in a trade secret is the power to make use of it to the exclusion of the world. If the world knows the process then the property disappears." 287 F.2d at 328. That risk is not negligible: Plaintiffs seek to disclose the Midjourney Code to **at least nine experts**, several of whom are early in their careers, have worked at competing AI companies, and may (perhaps are even likely to) do so again. *See* Lauter ¶ 7, Ex. C. The Protective Order cannot protect Midjourney if and when those same consultants, who cannot unlearn what they are exposed to, exploit their knowledge in connection with their next consulting engagement, company, or invention in the field of AI. Holz ¶ 12.

## V. CONCLUSION

Because the production of the Midjourney Code is irrelevant and/or disproportionate to the needs of the case, and less burdensome alternatives are available, this Court should deny Plaintiffs' motion.

Dated:         June 22, 2026          COOLEY LLP

By: */s/Bobby Ghajar*
Bobby Ghajar
John Paul Oleksiuk
Judd Lauter
Stephanie Schuyler

*Counsel for Defendant Midjourney, Inc.*

---

[5] Dr. Krein's characterization does not withstand scrutiny. He has signed protective orders in other cases involving state-of-the-art generative AI source code that are at least equally restrictive, including one that required him to **separately sign a non-disclosure agreement** in addition to the standard "Agreement to be Bound." *See* Lauter ¶ 8, Ex. D; Ex. E at fn. 1.