UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| DISNEY ENTERPRISES, INC, ET AL, | CASE NO: 2:25-cv-05275-JAK-AJR |
| Plaintiffs, | CIVIL |
| vs. | Los Angeles, California |
| MIDJOURNEY, INC, | Monday, October 19, 2026 |
| Defendant. | (1:30 p.m. to 2:40 p.m.) |

[REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL]

INFORMAL DISCOVERY CONFERENCE (ZOOM)

BEFORE THE HONORABLE A. JOEL RICHLIN, UNITED STATES MAGISTRATE JUDGE, PRESIDING

APPEARANCES: SEE PAGE 2

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: Nicholas Huynh

Transcribed by: Exceptional Reporting Services, Inc.
20079 Stone Oak Pkwy.
Ste 1105, PMB 237
San Antonio, TX 78258
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES:**

For Plaintiffs: KARA V. BRANDEISKY, ESQ.
Jenner & Block
1099 New York Ave. NW
Suite 900
Washington, DC 20001

DAVID R. SINGER, ESQ.
LAUREN MICHELLE GREENE, ESQ.
Jenner & Block
515 S. Flower St.
Suite 3300
Los Angeles, CA 90071

ZACHARY A. MARINO, ESQ.
Jenner & Block
1155 Avenue of the Americas
New York, NY 10036

For Defendant: JOHN PAUL OLEKSIUK, ESQ.
STEPHANIE J. SCHUYLER, ESQ.
Cooley LLP
55 Hudson Yards
New York, NY 10001

JUDD DAVID LAUTER, ESQ.
Cooley LLP
3 Embarcadero Center
20th Floor
San Francisco, CA 94111

**Los Angeles, California; Monday, October 19, 2026; 1:30 p.m.**

**(Call to Order)**

**THE CLERK:** Now calling Case No. LA-25-civil-5275, Disney Enterprises, Inc., et al versus Midjourney, Inc.

Counsel, please state your appearances for the record, beginning with the plaintiffs.

**MS. BRANDEISKY:** Kara Brandeisky on behalf of the plaintiffs, here with David Singer, Zachary Marino and Lauren Greene.

**THE COURT:** Good afternoon.

**MS. BRANDEISKY:** Afternoon, Your Honor.

**MR. OLEKSIUK:** John Paul Oleksiuk from Cooley LLP on behalf of defendant Midjourney. With me is Ms. Schuyler and Mr. Lauter.

**THE COURT:** Good afternoon.

**MR. OLEKSIUK:** Good afternoon.

**THE COURT:** Okay. Well, thanks, everybody, for being flexible and your patience since you moved this up and we kept you waiting a little bit. We apologize, we are doing the best we can. Unfortunately, there was a large criminal takedown this morning by the federal government and I'm dealing with that today. I only got a heads up about that over the weekend, so -- and I couldn't exactly explain it to everybody, but so anyway it is what it is.

So we're going to do as much as we can and I'm hoping

we can go for about an hour or so and address as much as we can and then circle back and keep following through.

So okay. So there's a lot here and some of this is very challenging, I've been reading it back and forth, back and forth because the two sides say the opposite things. And so I'm trying to wonder how to wade through.

But my plan is to jump in to the first issue that each side identified and then this deposition scheduling which you also identified as a joint issue, so let's just start there since that's at the top. Deposition scheduling, I'm not sure there's anything the parties want me to decide right now, but I wanted to just sort of pause and see if there's anything, I think both sides are, this is meeting and conferring and move forward. Who wants to say something for the plaintiffs?

**MR. SINGER:** Your Honor, we're meeting and conferring and proceeding. We proposed some folks who we want to depose on the other side and we are also putting together, at least for draft purposes a lot of our 30(b)(6) topics, so that we can get -- they can have a sense of who they're going to put forward and help us get that scheduled.

And I understand that Midjourney is going to be providing us with similar information this week.

**THE COURT:** Okay. Midjourney, what's the timing on that from your perspective?

**MR. OLEKSIUK:** Yes, we are continuing to meet and

confer on these issues. We'll talk today about the custodian search terms and things that are, in our view, a gating issue for getting too far down the list in terms of deponents, but we are working towards getting some names to the other side this week as well.

**THE COURT:** Okay. Right. And I realize that your first issue is basically you need to get discovery done, so we can move to depositions, but I trust it sounds like, Mr. Oleksiuk, you are trying to prioritize and identify depositions that in the very least you can start with. Is that going to be doable?

**MR. OLEKSIUK:** Yes, Your Honor.

**THE COURT:** Okay. So do the parties want a deadline to just sort of keep an eye on this? My main concern is it's going to be November very soon and there is just -- there's a lot to do and again the holidays are going to make it hard for you all to get this stuff done by January.

**MR. SINGER:** Yeah, I think we have -- look, I don't know that we'll finish everything on Midjourney's list today. We have other stuff, we didn't want to start like trying to shove too much into this one today, so we're trying to just focus on the issues, but there will clearly need to be another IDC in the not too distant future and I think that we should have clarity on a deposition schedule by then. And that, you know, that should be the Court sort of imposed, you know, at

the very least line.

**THE COURT:** Okay. So let me ask you this, Mr. Singer. You identified a number of individuals, are the -- and then you're going to exchange 30(b)(6) topics. Are the individuals you identified individual depositions or are those corporate rep depositions?

**MR. SINGER:** So we identified three individuals, Your Honor. And then we're going to have a one sort of 30(b)(6) on like corporate rep topics.

**THE COURT:** Uh-huh.

**MR. SINGER:** But there may be, we're sort of trying to figure out if we need any other individuals or if the 30(b)(6) will cover it, so we're giving ourselves a little bit of a room to add some other individuals. But at a minimum, we know we want to depose the three individuals we've identified in addition to a 30(b)(6).

**THE COURT:** And any reason those depositions can't go forward tomorrow, any other discovery impediment?

**MR. SINGER:** Well, you know, we have not gotten the training data yet. We just started going through (inaudible) so there's, you know, there's a lot of stuff that we still want to see and discovery we don't think has been produced. But we're the plaintiffs, we've got to keep the case moving.

**THE COURT:** Uh-huh.

**MR. SINGER:** So we just don't want perfect to be the

enemy of good here. So like, yes, there's lots of documents that we think are still owed to us that we want, but we just need to get these depos scheduled. So we're going to walk and chew gum and hope for the best, and that's why another IDC is going to be helpful, but we can't put off scheduling these anymore, even though we don't think we have everything. We're still going to move forward.

**THE COURT:** Okay. That sounds good to me and I agree. So, Mr. Oleksiuk, you're going to need (inaudible) I take it?

**MR. OLEKSIUK:** Yes, Your Honor. It may be till next week that we're able to actually have substantive (inaudible) names for the plaintiffs, but we will keep them informed.

**THE COURT:** Okay. Great.

All right. So then let's look at plaintiff's first issue they identified. This is our old and familiar issue of let's see, the V8 and tortious (inaudible) redux training source code. Let me see here how to begin asking a question.

Who's going to -- is this going to be you, Mr. Brandeisky?

**MS. BRANDEISKY:** Yes, Your Honor.

**THE COURT:** Okay. Let me ask you some questions about your concerns.

**MS. BRANDEISKY:** Sure.

**THE COURT:** So we did -- you did get a declaration

from Mr. Cruise (phonetic) and Mr. Cruise did say what I told him to say, now he said literally what I told him to say and nothing else. So I should have expected that.

So talk to me about the declaration, you know, because you're concerned about what was not produced and the declaration does say, it does cabin off what wasn't produced, so is it you just need more information or are you saying Mr. Cruise is wrong or lying, or one of those things, is it like factually not accurate or help me understand what you're saying because his declaration is -- does say the source code not produced, you know, was not developed -- is -- uses all the broad language that you want, that I took from you probably and I (inaudible) say.

**MS. BRANDEISKY:** Right. I think that the meet and confer process was helpful on this point because what came out in the meet and confer process is that Midjourney applied a different definition of what was responsive. You wrote into the order what the definition was and the declaration tracked that order, but what Midjourney applied was a different test. And they didn't tell us what that test was until after our first meet and confer with the experts.

But then in a letter on October 6th they wrote us, and I quote, because we had questions about, well, if this is the test you applied, then why is all this stuff missing. And what they wrote us was, quote, the code made available is that

which was used to implement training of V8 in the [redacted] that was used to [redacted] Midjourney training data, that was the responsiveness criteria applied, end quote.

And what we asked for for the training code, was a code developed to implement training of Midjourney AI models. And what we asked for, for the other one was code developed to implement cleaning, filtering, and any other trace and processes, not just [redacted] code.

And so this isn't just a semantic issue. It turns out that in practice, there was this very real practical difference between Midjourney's definition and the Court's definition. Because when Midjourney's counsel told us at our meet and confer is that a code was not used, but it was not produced.

But Midjourney read that word used into our request. There's a reason that we ask for the code that was developed and not just the code that was used, because we're asking for code that shows the developer's intent to developing the code, even if it's not part of the narrow slice of code, that's actually used to train --

**THE COURT:** And I got that, thank you. And you did -- that was conveyed well, so I understood all that from your write up. But you can take a look at Mr. Cruise's declaration, it's paragraph 4 and I have it. I can share my screen.

Let me know if I'm sharing the right thing and if you

see that. Are you seeing paragraph 4?

**MS. BRANDEISKY:** Uh-huh.

**THE COURT:** So Mr. Cruise says sort of the opposite of what you're saying, right, you're faulting Mr. Lauter for not saying, what I produced is this, but Mr. Cruise did say, what I didn't produce is not this, you know, he does say there are many source codes in our repository that is not produced, was not developed. It's the language you wanted. Was not developed to implement training of and it's very broad.

**MS. BRANDEISKY:** Right. And what I understood from the meet and confer is that when Mr. Cruise said that, I'm not accusing him of lying, I'm saying that it turned out that what he meant when he used those words is not what we asked for. And I suppose I can allow Midjourney's counsel to explain this to you in their words. But I understand that they interpreted developed to implement training to mean, used to implement training because if it wasn't -- they only thought that it counted if it was used, they thought the implemented meant that it had to be used.

**THE COURT:** Okay. And you're --

**MS. BRANDEISKY:** They read out of it developed.

**THE COURT:** And you're drawing that conclusion from conversations, meet and confer with Mr. Lauter.

**MS. BRANDEISKY:** Both conversations and that explains the gaps that we see and that Midjourney confirmed are there.

You know, we asked them where is the evaluation code, where's the oblation code, where is the notebooks and they confirmed that it's there and it wasn't produced for this reason.

**THE COURT:** But is this what you're asking for? I mean, if this were true, did you get what you wanted? You know, this doesn't have the caveat read in. It says, the things that were not produced was -- that code was not developed to implement, it's overbroad, it's very broad in covering what was not produced. If that were true, is that what you're asking for?

**MS. BRANDEISKY:** This is what we're asking for, but this is not what was given to us.

**THE COURT:** Okay. So let's pause there, because that's what I'm trying to figure out is you all are saying the same thing or if there's actually a factual dispute.

Mr. Lauter, what -- can you help us out here from your perspective?

**MR. LAUTER:** Sure, thanks, Your Honor. So I don't actually think that there is a delta from our perspective between the term used to implement training of V8 and developed to implement training of V8 or be that issue [redacted].

And a lot of what appears to be motivating plaintiff's perception that there is material that is missing from the production are inferences from Dr. Trine (phonetic) that are misplaced.

So in the IDC update, we gave an example of one of these. There's apparently a file in the tortious static redux repository named configurations and Dr. Trine inferred that based on the location of this file, that it must have something to do with the training of the [redacted] that Midjourney made code available for.

We looked into this with our client and it turns out that it doesn't. We confirmed that it doesn't. That that file actually pertains to an older model that was never used and that was deleted three years ago and years before this litigation was initiated.

Plaintiffs throughout these discovery disputes have been peppering Midjourney with questions like that about file names that are seen and material that's been produced, locations of what they believe are logs related to the training of Midjourney's models and under the pretext of trying to suss out some purported discovery deficiency and have demanded that Midjourney investigate highly technical issues and provide a narrative responses outside of the course of normal discovery mechanisms like interrogatories or document requests or deposition testimony.

And we've been largely accommodating of this, but a lot of what is motivating plaintiff's demands with respect to the purported insufficiency of the code that has been made available for them and the updated (inaudible) that Midjourney

has committed to making available is speculation that is frankly (inaudible). It's a lot of what Dr. Trine has expected to see in the code isn't there.

**(Background noise occurring in courtroom with multiple speakers at 1:45 p.m. onwards)**

**THE COURT:** Okay. Well, let me -- and I -- so thank you and you did -- you conveyed all that well so I have understood that. Then let me ask you this question, Mr. Lauter, is there any reason that you could not make this declaration in the affirmative? This is a declaration from Mr. Cruise that says, the source code we didn't produce was not developed to implement, et cetera. Is -- based on what you've told me, you're saying that you didn't apply a different definition, I take it you're saying this declaration is true, and so is there any reason you can't serve a declaration that says this affirmatively? That says, we have produced from the repositories all source code that was developed to implement training of Midjourney AM models, et cetera, and we have produced from the repositories all source code that was developed to implement cleaning, filtering and/or any other creation processes?

It's the logical conclusion, if this declaration is true, I would think you could state this affirmatively as opposed to what you produced from the repositories. Any objection to that?

**MR. LAUTER:** I'd like to discuss it, but I don't see why not.

**THE COURT:** Okay. So fair enough, I appreciate you thinking about that. So, Ms. Brandeisky, if you get a declaration from them that says in no uncertain terms these things -- is there something, you know, should that be satisfactory?

And I realize, you know, look the context here is there is something going on obviously. Midjourney elected rather than just producing more repository, to produce something a little different and Midjourney has acknowledged that that created some issues and they acknowledge that they needed to make a supplemental production. And I take them saying that they're ready, willing and able to do that, and I guess they haven't done that, because they think that you asked them not to, but maybe we should let them give you the supplemental declaration, let them make the production and then see where we are. What do you think, Ms. Brandeisky?

**MS. BRANDEISKY:** I don't think that would be satisfactory because they've already told us that they have this different interpretation. And I think that Mr. Lauter's example is reflective of that. It's a model that they developed and never used that's responsive to our request and they've written it out.

And so I still think that there is this fundamental -

-

**THE COURT:** Let's just stop there. I didn't hear that. Mr. Lauter's, you know, has said, you know, he's thinking about it. But he would give us the declaration. It just says developed. It doesn't -- there's no caveat for not used. So, Mr. Lauter, am I missing something? Are you trying to make some distinction there?

**MR. LAUTER:** Well, Your Honor, frankly I don't understand how a model that was never used, that is not the -- related to the code that plaintiffs sought with their discovery request and I can't remember if it's request No. 10 or No. 11 --

**THE COURT:** Uh-huh.

**MR. LAUTER:** -- but if it wasn't implemented, developed to implement the training of the [redacted] that was for something that was never used and was deleted in 2023, how is that responsive to plaintiff's request? I mean, that kind of --

**THE COURT:** Okay. But the point it's not whether --

**MR. LAUTER:** -- (inaudible) the whole game here which is that plaintiffs have this really broad interpretation of developed to implement training that encompasses any code that preceded the actual training of the models? That can't be the appropriate interpretation of those requests, that's not what plaintiffs asked for in those requests.

**THE COURT:** Okay. But the distinction is not whether it was used, it was whether it was developed to implement the training of Midjourney AI models. I mean, that's what this says.

**MR. LAUTER:** Well, no, specifically it was developed to implement the training of the [redacted] that was the subject of plaintiff's motion to compel, or in the case of V8, it was developed to implement the training of that model. And keep in mind, there's no dispute over the production of Midjourney's code for prior models we were just talking about V8 and the tortious static model. I recognize that plaintiffs had said that one of their requests also concerns curation and processing of training data generally, but other code has already been produced that relates to that.

There's not code in tortious static redux and we've had conversations with plaintiffs about this already. There's not code in that repository, to our knowledge, that pertains to processing or curation of training data other than this [redacted] related code that we've been having this dispute over for several weeks now.

**THE COURT:** Okay. But we're only talking about these two repositories, right, why is this worth fighting about, why it's used or not, why not -- why don't we just agree that you'll produce all code in these repositories, we're just talking about these two repositories, all code that was

developed to implement without regard to whether it was used or not, why would you care, if -- frankly it seems it'd be easier for you.

**MR. LAUTER:** I think it's very difficult to interpret what the request even is at that point and we've had some conversations with our client about this about what that would even mean to take on plaintiff's very broad interpretation of these requests. And it's difficult to discern what is or isn't, you know, in some attenuated way related to the development of these models, as opposed to just starting with the code that actually implemented the training and then providing all of the history and all of the commence associated with that code. And if plaintiff's stated objective is to understand how that code works, well then they're getting the code that shows them that.

And so to Your Honor's point, we would suggest that they take us up on our offer to provide this updated gift bundle that's in a format that is what plaintiff's expert has represented that they need to be able to analyze the code with off the shelf industry tools.

We've taken another look at this with our client and I -- we're working on providing it in a way that will include additional information about the structure of the repositories, the branches in the repository and that code can be made available to plaintiffs in short order. And we would suggest

that they take us up on that.

And if there's still something that they perceive as missing, that's a barrier to them understanding how the model is trained, then we can continue to have that conversation.

**THE COURT:** So how do you know that this declaration is factually accurate, based on what you just said? Because you didn't qualify this declaration. You said that Mr. Cruise said that based on his reasonable investigation he's confident, he has sworn to it under penalty of perjury that the non-produced code was not developed to implement training. How do you know that's true?

**MR. LAUTER:** Our client looked into this and that was their determination, based on what was collected.

**THE COURT:** So what did they collect?

**MR. LAUTER:** So they collected the code that -- for all of the production runs of V8, and they collected the code for the [redacted] that was at issue in plaintiff's motion to compel regarding the tortious static repository and they produced all the revision industry and with the exception of the commence that we -- as we discussed in the last IDC should have been included but weren't. So all the revision has (inaudible) and all the commence associated with that code.

So basically working backward from the code that actually trained these models and then all the history associated with that. And that includes history of the

development of the code. And so that's part of what doesn't really make sense from the perspective of Midjourney about what plaintiffs are asking for regarding the development history of the code when that's part of what they've been given.

**THE COURT:** Okay. Well, let me ask something else for you. I mean, I -- what I take from your write up and what I heard you say was expressing a level of frustration with how much time and energy that Midjourney is taking answering these questions, but I want to just think about -- I mean, I think some of this is your own doing and I wonder if it makes sense to me I would be thinking about if there's something that slightly over inclusive that Midjourney could produce that would just put this to bed. Like I'm not sure that this is worth -- I just don't agree with you that this doesn't seem like it's worth the immense amount of time and energy.

But the reason this is happening, I think as you just acknowledged is because of how precise and limited you're being and picking and choosing very -- it does beg the question, and just so in fairness to plaintiffs, if you would -- obviously if you would just produce the repositories this would be done. I realize you don't want to do that, but is there something -- I'm trying to find something that is perhaps cleaner that doesn't raise all these questions, that you could just give them and say here, have -- you know, you're just making it available in the review and I guess I just worry, you know,

Mr. Lauter, we could follow your approach and you could finish your production which I want you to do and then they can -- they're going to have more questions. But there is a reason they have questions it's because you're doing this in a very -- you're kind of doing this in a go get way, kind of like that they you hate that they do, in fairness.

**MR. LAUTER:** Well, Your Honor, again I think that Midjourney tried to do this in a way that was principled and consistent with the Court's order and I don't -- there was not some attempt here to play semantic games with what was asked of them. This is what those requests asked for, what the Court ordered and is consistent with Midjourney's interpretation of what they were obligated to do.

**THE COURT:** Maybe also think about what you could do to clarify this because you have left me with more questions about this declaration and now I don't know if it's true, unfortunately. I'm wondering what this declaration means. I thought I knew and when we started this hearing, I thought you were telling me it was true and now I --

**MR. LAUTER:** Your Honor, I am telling you that the declaration is true and to your point earlier about some further declaration, it's something that we'll need to consider.

**THE COURT:** Okay. Think about, you know, something that actually tells plaintiffs what it is you produced clearly

and what was not, so there's no disagreement.

Ms. Brandeisky, what do you think at this point?

**MS. BRANDEISKY:** Your Honor, I guess I would say that as Mr. Lauter pointed out, Midjourney has already produced this code for versions 4 through version 7 and there was no confusion about what we were asking. They just produced the entire repository. It was not this complicated, they didn't pretend to not understand what we were asking for.

And so I think that the path forward is clear. If it's not clear, and they still want to withhold parts, we absolutely do need to understand what they're withholding and why, what definition they're applying and we have proposed a method of seeing that that would also allow our experts to verify it, because to date what they've produced to us is this format that our experts have never seen before. And that normal tools that they could use to analyze this, it would take a minute to figure something out, it takes them hours, and they have to travel to Palo Alto and only three people are allowed to look at this.

So, I mean, like we currently do not have a production that we can reasonably analyze and so we made this compromise proposal. We didn't learn until the IDC statement that they had rejected it. And at this point, we just don't have the benefit of time anymore. And this isn't just an expert question, we want to depose fact witnesses about this

and we don't have anything that we can analyze.

And so if, you know, if Midjourney insists, we can go through another round of this where they make another production and then we try to figure out what they really need and what's really going on. But like we're just -- we're out of time and we can't keep doing this.

**THE COURT:** Well, we do need you to just make your production, Mr. Lauter. So there's no reason for them to delay that, right, Mr. Brandeisky?

**MS. BRANDEISKY:** Yes, and I would hope that it would be in the format that we requested, but --

**THE COURT:** Okay. So we do --

**MS. BRANDEISKY:** -- I don't know if we want to meet and confer about that.

**THE COURT:** So we do need -- so, Mr. Lauter, I take it you can do that promptly and then we do need you to look at as well, but -- Ms. Brandeisky, I mean in fairness to them.

**MR. LAUTER:** Yeah, so in terms of the gift bundle that Midjourney's committed to producing we can do that in pretty short order. I would just note it's a lot of spinning plates at the moment, and Midjourney personnel are currently assisting with other discovery obligations like ensuring that the training data that is owed pursuant to the training data protocol stipulation is produced in a timely manner and they're also helping out with some log related requests that plaintiffs

had raised. But I would expect within the next week we should be able to make the code available in the source code room.

**THE COURT:** Okay. Well, let me give it some thought in terms of some further things that both sides can do. I mean, one thought I had is again, I think what I'd really like you to do, Mr. Lauter, is to go back to your client and think about what you could do that would be easier for everybody in terms of a slightly more whole over-inclusive production that you could live with that would put this to bed and sort of would not engender these questions.

You know one thought I'm having is if you can't -- if the two sides are going to say different things factually then maybe the only thing I can do is have an evidentiary hearing with your experts and that would be terribly painful and time consuming. And maybe that would motivate you all to figure something out to not have to do that, but I don't know what else to do ultimately if I can't figure out what was produced and what wasn't.

**MR. SINGER:** Is it possible, Your Honor -- this is David Singer, just for the courtroom -- court reporter --

**THE COURT:** Uh-huh.

**MR. SINGER:** -- that if they're going to take another run and produce this, get repository version that -- and if there's going to be holes in it, I mean, part of what we're dealing with here is a team of experts who are saying this is

Swiss Cheese and we can't make heads or tails of it and it's costing us a fortune and a lot of time, whereas if they just produced it in the way it was kept in the ordinary course of business, this would have been much, much easier, that if the Court is going to allow them to produce something with bits and pieces withheld that they at a minimum tell us what it is that they're withholding, kind of like a privileged log, where I guess they're saying these are trade secrets that are so secret, more than just ordinary source code that somehow even attorney's eyes only or expert eyes only can't see, our expert is telling us that you're talking about things that live right next to each other, they must connect.

And they're saying, no, that's crazy, your experts don't know what they're talking about and then in all these meetings that I've listened to, we keep asking them and their experts, just describe to us what it is you're withholding, because everything is just like a big mystery and they refuse to describe what they're withholding.

And so our experts are like, well it looks like it's directly related to like this whole [redacted] because it's right there, they go together. The other side is saying, no, that's crazy, they have nothing to do with each other, but they won't tell us what these parts relate to so our expert can say, oh, okay, that makes sense.

Like that's a -- that would maybe the grease the

wheels here a bit if they were ordered to produce this and if there's going to be holes in it, that they have some description of, you know, what's in the hole.

**THE COURT:** So I don't know what a repository looks like, but I've been sort of wondering the same thing along the lines of could you provide -- could you do a data map, can you like sketch out like and here's the chain that I gave you, and here are the missing pieces is that a thing that would make any sense in this context?

**MS. BRANDEISKY:** Your Honor, my understanding based on our experts have described it to me, is that's essentially what we proposed. It's a partial clone. And so they would give us just the full code of the parts they want to give us, but then they would give us the file names of what they're withholding. And then that would allow our experts to use the hashes to actually verify that they're giving us what they say they're giving us and we would be able to see the file names for what they're withholding.

And my understanding, based on the IDC statement, is that they are not willing to do that. But that is exactly what we proposed.

**THE COURT:** Okay. So, Mr. Lauter, why don't you talk about that if you can, because I know you didn't have a chance to address that in the IDC statement. And I wasn't really sure what a partial clone is, but if it's being represented as sort

of a mapping.

**MR. LAUTER:** Yeah, so our understanding is that the partial clone would basically include all of the filings from the repository, but without the contents of the files themselves. So we have -- we did discuss this with our client following plaintiffs have made this proposal during the last meet and confer. And we appreciate that after a month plaintiffs were willing to offer some proposal that was an alternative to producing the entirety of the repositories.

But the problem with plaintiff's proposal in addition to the fact that it seeks inherently irrelevant nonresponsive information about out of scope source code, is that even the file names and the additional information about the structure of the repository that would be disclosed by this partial clone implicates Midjourney trade secrets that are the whole impetus for this compromise in the first place. And so it kind of obviates what we've been trying to avoid the whole time and --

**THE COURT:** Well, it's materially better for it, it is not the same, I get your concern.

**MR. LAUTER:** I acknowledge it's --

**THE COURT:** It's material, yeah.

**MR. LAUTER:** -- not (inaudible).

**THE COURT:** Yeah, it is a world of difference. So, okay. You know, look, I mean give it some thought. The partial clone sounds appealing to me if I fully understand what

it is and I get it, it's going to engender questions, so I get why you don't want to do it and you're going to have to answer those questions. But as a compromised position it sounds pretty reasonable, given how uncertain it made me about the accuracy of the declaration, so I'm not going to order anything right now.

But I'm going to tell you to propose something, like see if you can't resolve this in a way, propose some way of resolving this that is a middle ground that I can say yes to, and if it's reasonable I will, and if you don't offer anything, then their proposal isn't reasonable, right, I mean, it is a compromise from their position and it is much better than producing the whole repository to use, so give it some thought. We may be identifying a middle ground solution, but I want to let you try to come up with something that you'd prefer, Mr. Lauter. Okay?

**MR. LAUTER:** Okay.

**THE COURT:** Okay. So we'll leave it there and I'll set some deadlines and we'll see if the parties can't now move towards something that is workable.

Okay. So let me go to Midjourney's top ranked issue, which was the search terms I think.

**MS. SCHUYLER:** Yes, Your Honor, Stephanie Schuyler for Midjourney on this topic.

**THE COURT:** Okay. Great, let me just get caught up

there, but thank you.

**(Pause)**

**THE COURT:** Okay. So I think I get your concern, Ms. Schuyler, but maybe just briefly, because I have reviewed this, tell me about kind of what you've received so far, just big picture. It's some (inaudible) small number of e-mails.

**MS. SCHUYLER:** Right. Yes, I can pull up the IDC where I think we listed the numbers, but they're small and they're much smaller than we would expect from 12 plaintiff entities, making up the three plaintiff groups if they'd done a fulsome search using defensible methods.

And therefore, it wasn't surprising to us when we, after months of asking, finally received the search term hit report from plaintiff that listed out the search terms they had, in fact, run and it turns out that the vast majority of them were just running the term Midjourney on -- for the most part the custodians we had identified to them as having Midjourney accounts.

And then Disney, I believe Disney and Warner Brothers also ran MJ, Universal didn't, because of concerns about a Michael Jackson project, rather than adding limiters to it. And then there were two other terms that I think were run, which we list in the IDC, one related to a press statement that Universal ran related to Midjourney and Gen AI and then there was one other one for a cease and desist letter sent to Google

by Disney and the hit counts for those were quite low.

And so, you know, we've asked a number of RFPs in this case and we think a lot of them are not covered by these terms. It sounds like plaintiffs maybe said go get searches for literally everything else, but even as to the RFPs that they identified that they used search terms for we think these terms were not broad enough to encompass a reasonable search for those documents and so we proposed some additional searches that we would request that plaintiffs run.

We understand plaintiff's position is that they haven't had a chance to respond to those, but given the late, the late date and the fact that discovery is closing and depositions are supposed to be started, we just don't have enough to know even who to depose, let alone what to ask them about.

And so we would ask the plaintiff be ordered to run those searches or give us a reason why they can't. And so I think that's our position on this, but I'm happy to address any specifics that Your Honor had questions about.

**THE COURT:** Okay. And so just thinking about this, you want me to basically find that they haven't conducted a reasonable diligent search and inquiry based on the nature of the request and the search terms that have been disclosed.

**MS. SCHUYLER:** That's right.

**THE COURT:** Okay. Who wants to address this for

plaintiffs?

**MS. GREENE:** I'll be taking this issue for plaintiffs, Your Honor, thank you.

**THE COURT:** So what are your thoughts? I guess I don't have an initial question other than letting you respond.

**MS. GREENE:** A couple of initial responses, Your Honor. First, these are issues that were first raised in a letter we received on October 13th, which was two days before we received this IDC statement that had even more on these issues.

So, you know, we can -- you know, we are in the process of reviewing their letter and can commit to getting back to them in writing on those issues. Just with respect to, you know, the claims made about the searches and the search terms, I think there are a couple of sort of gating issues.

First, defendants haven't really identified like which RFPs we're talking about. It's sort of all jumbled together in a way that makes it really difficult for plaintiffs to, you know, sort of formulate a response and sort of, you know, talk about these issues coherently for Your Honor but.

**THE COURT:** I guess I'm wondering, you know, I have a similar feeling as I did in the last one for Midjourney. I'm wondering like, you know, you're the plaintiffs in this case, in this very, very big case with lots of plaintiffs, and you know, it does seem to me just, you know, with very little

information, just you produced very little e-mails, that is surprising. And I wonder, I guess I wonder why you wouldn't want to -- are you -- I'd be a little worried that isn't the risk of being under inclusive and not producing documents and the harm that that could bring to your case later on is not worth having, you could easily eliminate by -- I guess I'm just surprised and would encourage you to think about, doesn't it make sense, given how big this case is, to run some search terms even if they're overbroad and get some stuff out there, even you know, why not, get it out as opposed to I worry if discovery is closed, we go into depositions and it turns out you didn't produce something, you're, you know, sort of handing a big argument to defendants -- defendant.

**MR. SINGER:** This is -- I mean, Your Honor, if I may, this is David Singer again. This is the problem about trying to litigate everything all at once. I can answer Your Honor's question and so can Ms. Greene if we talk about a particular RFP.

For example, there's a whole bunch of them that asks for any number of things related to Midjourney. There's a bunch that just mention Midjourney in the RFP.

**THE COURT:** Uh-huh.

**MR. SINGER:** We could have come up with 30 different search strings to hone in on each of those, but instead we said, you know what, they all mention Midjourney, let's just

use the search term Midjourney it'll be a bigger review, but we'll do it anyways.

**THE COURT:** Yeah, that makes sense.

**MR. SINGER:** Which we did. And now they're quibbling because Universal doesn't -- no one has searched for Mid-Journey, there's no evidence in the record that anyone's ever misspelled Midjourney that way, but that's the kind of thing that we could meet and confer on.

Or Universal, MJ, everybody at Universal refers to MJ as the Michael Jackson project, no one's referred to Midjourney as MJ. But if it could end a fight and we could meet and confer on it, fine. But there's no -- then there aren't a lot of requests here and that's why they're not putting the requests in front of Your Honor.

**THE COURT:** Well, I have one. That --

**MR. SINGER:** Let's talk about it, yeah, let's talk about it.

**THE COURT:** But, so yeah, no, I hear you. What I would -- and you may have done this, but what I would encourage you to do is some test searches. So I heard you say, you know, there's no evidence that anybody has misspelled Midjourney, referred to it as this way, and maybe you've done this, but I would encourage you run some test searches, run some -- you know, that's easy to do and then you diligence and maybe you have a Bates -- because maybe you catch one or two things, but

you know, okay, so we're all on the same page. That would make sense --

**MR. SINGER:** Yes, fine.

**THE COURT:** Again, I would just say objectively speaking it's your level of production of e-mails seems really small and again, my only thought is why fight about this, the risk to you of having not produced something as the plaintiffs in this big case seems not worth having and you'd like to just eliminate it.

But okay, one of the ones that jumped out to me, because I hear you, I was sort of focused on the same thing like what's an example. You do have this example of analysis regarding, I think it was like the impact of generative AI, something like that. Let me see.

It was something like any analysis of --

**MS. BRANDEISKY:** Is it 47 that you're looking at, Your Honor? I wasn't sure.

**THE COURT:** Yeah, where is it. Let me see.

**MS. BRANDEISKY:** I think documents and communications concerning any study, survey, report or analysis relating to Midjourney's economic impact on your business, that one or?

**THE COURT:** Right, and any of those, sort of these analysis that was done, you know, any documents or communications related to. And I realize, you know, what I saw in the letter is, you know, you reached out to in house counsel

and you talked to some key groups and sort of said, hey, has anyone done any analysis on these things and the answer was no and so there is nothing. And then no search terms were taken.

But I guess my concern there or my suggestion would be wouldn't you want to test that a little bit? You know, I realize, you know, you've asked people hey, did you do any analyses, but you know, isn't it possible that people sent e-mails or had some discussion about it that maybe they're not realizing, I mean analyses can be really broad, or you know, didn't come to mind. So I'm not questioning that some in house lawyer went and talked to some people, but again, these are sort of really broad topics and you're asking a lot of people and, you know, they may answer you honestly and not realize, oh, yeah, well we did have that conversation way back when, and there is an -- you know what I mean?

Like why not test that with, you know, pull a full custodians here and there and run some searches, that sort of thing.

**MR. SINGER:** I think it gets and I'll let Ms. Greene jump in too, the problem is you're talking about an IP company with the IP group is the lawyers. So when you talk about the impact of, you know, things like market harm or harm, right, you're talking about harm to intellectual property.

**THE COURT:** Uh-huh.

**MR. SINGER:** So when we've spoken with our clients

and I'm not disclosing anything privileged but just on a very high level, the sorts of things that we agree to produce and you have to look at what we've agreed to produce, they've asked for a lot of things --

**THE COURT:** Right.

**MR. SINGER:** -- and we've agreed to produce, you know, any sort of study or report or anything like that, that's not privileged, right. Now you're talking about pretty new services that, you know, came around very close to when we filed the complaint. So we're not talking about VCRs that go back decades. And the question is who at the company would have done any such analysis and the answer is, it would have at least involved one of the lawyers from the IP groups, because this is IP.

It's not like there's like, you know, people just off doing this. So if there's -- you know, we are --

**THE COURT:** I realize you would need distinctions on being authorized and non-authorized, but I'm sort of positing one that's --

**MR. SINGER:** Right.

**THE COURT:** -- broader, where it's not limited to authorized.

**MR. SINGER:** We are not -- again there's -- we're -- if there are questions to be asked of who -- you know, I guess the question that -- what I'm hearing is, would there be any

nonprivileged analyses or studies of the impact of generative AI on the market for works (phonetic) that had nothing to do with the lawyers, and you know, I guess short of saying to our clients, where do we want to look for something like this, and they're like, well it just so happens there's a group of people whose job it is to deal with stuff like that.

So you're come to the people whose job it is to deal with stuff like that and there may be some -- you know, obviously there's privileged stuff going on right now on this question, right, but was that sort of analysis done before in a nonprivileged context, the answer is no. I don't know why that's such a big surprise to anyone that with this new service that just started getting launched, right, shortly before we sued that no like studies or analyses were done in a nonprivileged way and it's an IP issue.

Like I guess that's where I'm -- we're sort of -- it's sort of like with Midjourney, it's like saying, you're telling me there's no e-mails with Midjourney that are more than two years old, that's crazy, but there was no Midjourney two years before we sued.

**THE COURT:** Uh-huh.

**MR. SINGER:** Like so what is it, why is it such a surprise that there isn't more? That's really our question. What is it that they're looking for that they think exists that, you know, that makes this so suspicious. And, of course,

Your Honor, if there were -- our clients are going to prove handily in this case that all of this stuff does create market harm. And so if there is stuff like that, it would be helpful to us and as Your Honor said, we would be eager to find out. But you're talking a new service that involves IP, so we're sort of at a loss and we don't really know why it's such a big surprise.

If there is something concrete, this idea of just like, oh, just run more searches, like that don't involve the IP team and we're not -- we didn't agree to produce every e-mail that mentions any generative AI, we never agreed to do that. We agreed to look for and produce any studies or reports, whatever the language is in our response.

**THE COURT:** Uh-huh.

**MR. SINGER:** And so, you know, is there -- like does -- you know, does Midjourney have a suggestion of something that wouldn't involve our IT lawyers that would be a study or a report about this?

**THE COURT:** Okay.

**MS. SCHUYLER:** If I can respond briefly, Your Honor.

**THE COURT:** Let me ask Ms. Greene, just so we can (inaudible) if she wanted to add something.

**MS. GREENE:** Well, I think what Mr. Singer was hinting at or getting at towards the end, sort of there's an expectation difference here. You know, the plaintiffs aren't,

you know, talking about Midjourney, or talking about these issues in e-mails in a way that Midjourney might think they are. And I also did want to note and we put this in our search term hit count list, that just because we did use search terms to conduct searches for some RFPs, that's not the only thing that counsel did with the clients to collect documents to search for and collect documents responsive to that specific RFP.

**THE COURT:** Okay. And I haven't seen -- I don't think I have -- let me see. I don't think I have the letter on this, do I? I don't think I've seen the letter that you have, Ms. Greene, that you're working on a response to.

**MS. SCHUYLER:** I don't believe so, Your Honor. I don't think we --

**MS. GREENE:** Right. I don't believe we provided that, Your Honor.

**THE COURT:** Okay. So okay, Ms. Schuyler, does the letter, you know, they're sort of complaining that you don't have specific examples of or there's some specifics in there in the letter that they can chew on and respond to?

**MS. SCHUYLER:** Yes. I mean, the letter does walk through the deficiencies pretty carefully, request by request and search by search and the exhibits that we did attach to it, which we did provide Your Honor, it suggested additional search terms that goes request by request or categories of requests

and suggests custodians and search terms.

And if I could just respond briefly to Mr. Singer's point. I mean, the custodians that they ran searches on were largely limited to the custodians we identified to them, and they're saying now well the IP team would be the only team discussing harm caused by generative AI, but these companies have founded, you know, created whole departments whose job it is to evaluate AI and consider how to implement AI in the business.

And those -- it's strange crudity that those groups are not having conversations around harm caused by generative AI or positive impacts caused by generative AI. And, you know, it's strange crudity that every flawed analysis conducted at the company would be done by the IP lawyers, for instance.

And, you know, even if IP lawyers are involved in the conversation with the business team, that doesn't necessarily mean those documents are all privileged. It just sounds like plaintiff's counsel hasn't gone to look at them or look for them or run searches for them and they're just taking representation from the in house team that these don't exist or if they did exist we would be involved in them. And that just doesn't seem like enough to have fulfilled their obligations under the rules here, particularly given how few documents they have produced in discovery.

You know, they should do a real search and identify

them. And so our suggestion to the extent Mr. Singer was asking for one is, is the search terms we gave and the letter that we sent, and if they don't want to run those, I guess we would like to understand why, but we'd like to propose alternatives. And we've taken our best shot at proposing additional custodians who might be relevant or at least categorically if we don't know their names for plaintiffs to consider searching, but that would be a start.

**THE COURT:** Okay. And I trust you've taken this into account, okay, yeah, I see it here. So you've identified -- you know, to Mr. Singer's point you're not just going off your RFP, you're going off what they've committed to produce and sort of taking that, sort of saying, well you should have a broader search for these things, it's not what you asked for, but it's what they have agreed.

**MS. SCHUYLER:** Correct. And we did our best to tailor them and if to the extent that the search terms, you know, produce too many hits, then they -- if they think that's unreasonable, they should tell us what the hits were and propose an alternative. I mean, we're not trying to be unreasonable, we did our best to target the documents we think they've agreed to produce, as we understand it.

**THE COURT:** Okay. So maybe we need to give Ms. Greene an opportunity to respond and sort of see where are. And I guess, you know, try to get a specific as you can on

certain individual requests and then I guess the question is, will be, Ms. Schuyler, do you think you have, is there enough evidence for me to decide that their investigation has not been reasonably diligent at this point or, you know, do you need to take depositions and there -- does there need to be something further to establish that there is something?

**MS. SCHUYLER:** I mean, I think our position is that their search has not been diligent enough and that's why we suggested additional terms that should be run to try to identify further documents. And we think that the letter that plaintiff sent describing their efforts to identify responsive documents doesn't support a diligent search, to the extent it includes specifics at all, it's essentially reliance on in house counsel's representation that they would have been involved in these conversations.

I mean partly because of plaintiff taking this really narrow view of what search would be reasonable and what documents are responsive, we served some additional broader requests since this issue came up in dispute, because we're concerned plaintiffs just are going to keep refusing to do any reasonable search. And so now we're going to have to dispute broader RFPs that asks them to, you know, run searches for, you know, all communications about a given topic. And if they had done a more diligent search, maybe that wouldn't be necessary. But we're not sure what to do at this point because depositions

are coming and we have a handful of e-mails and it's just not enough.

**THE COURT:** Okay. Well, why don't we start there, Ms. Greene. Any issue with responding next week, I'm going to sort of set next week, a week for the deadlines for everybody for the follow up, to keep things moving.

**MS. GREENE:** I think towards the end of next week we'll be able to get a response. I know our team had some conflicts this week that it's going to make it a little bit harder for us to get a faster turnaround, but I think by the end of next week we should be able to get a written response out.

**THE COURT:** Okay. Well, let me give that some thought and let the parties try to at least go back and forth a bit and see where we are. I guess again, you know, I would ask you to consider if it makes sense to be over inclusive on some of this to get it out, so you're well protected, that not worth the risk, or even fighting about if there's some searches you can run and produce.

Okay. Let me sort of see where we are. Let's take a stem through the other issues and see if we can't come up with a plan if we can't resolve anything else.

**MS. SCHUYLER:** There's on easy one, Your Honor, which is the documents that you've already plaintiffs to produce or they've agreed to produce and we're just looking for a date

certain for production on those.

**THE COURT:** Oh, right, is that like 4 or something?

**MS. SCHUYLER:** I think it's -- yeah, it's the open AI and financial related documents. I think it's issue 3. Issue 3 of ours, issue 3.

**THE COURT:** Okay. Any thoughts on that plaintiffs, who wants to handle that?

**MS. GREENE:** I'll be handling that as well, Your Honor. With the financial documents, those have been produced, so that issue has been resolved. With respect to the open AI documents as we put in our statement, plaintiffs are aiming for October 30th. The one reason why we would ask the Court not to set a hard deadline, is just because the productions sort of relies on some third party consent issues that we are diligently working through. But we're, you know, are a little bit worried about, you know, having a hard deadline in case something happens with those third party issues.

**MS. SCHUYLER:** Your Honor, if I could just ask one question. We had a meet and confer last week, and plaintiff confirmed the financial production was not complete. I guess my question is, were the remaining financials produced in the interim, just so we know where to go look for that?

**MS. GREENE:** That's right, yes. There's a handful of remaining financials that I believe went out on Friday.

**MS. SCHUYLER:** Okay.

**THE COURT:** Okay. Ms. Schuyler, do you have any further concern about the October 30 best efforts or what is -- is Midjourney also completing productions, where do you stand with things?

**MS. SCHUYLER:** I'm sorry, the question is on Midjourney's production?

**THE COURT:** Is Midjourney also completing productions now or kind of where do you stand?

**MS. SCHUYLER:** I don't know if Mr. Lauter has more information on that, I've been less involved in that process.

**MR. LAUTER:** Yeah, so we're in the process of completing the production of the turning (phonetic) data, there was supplemental production related to Midjourney's weights and biases logs that was delivered I think on Friday. And we're tying up some other loose ends around some of plaintiff's other asks.

**THE COURT:** Okay. And remind me, are there -- is there like a substantial completion of production deadline that we're all trying to meet? There's so many in this case, I can't recall.

**MR. LAUTER:** We had a substantial completion deadline that has already passed, I forget what the date of that was but --

**THE COURT:** And that was probably for discovery that had been served by that -- by a certain date?

**MR. LAUTER:** Yeah, that's right.

**THE COURT:** So I assume there was no issue there since no one's complained about, so this is probably additional discovery or newer discovery.

**MS. GREENE:** Though I will flag that plaintiffs I believe on Friday sent a letter identifying some additional issues with the documents that Midjourney had committed to produce that haven't been produced yet. So there are some issues there that we anticipate, you know, hopefully not but if we're not able to resolve it, we anticipate discussing with you at the next IDC.

**THE COURT:** Okay.

**MR. OLEKSIUK:** Your Honor, John Paul Oleksiuk here. From their issues that I'm not sure we'll have time to get to today also relate to matters where Midjourney believes the plaintiffs did not complete substantial production by that deadline.

**THE COURT:** Okay. So as to issue 3, Ms. Schuyler, is that acceptable, they're going to best efforts and if they don't meet the October 30 deadline, obviously you could bring it up, and I'll be seeing you again probably around that time.

**MS. SCHUYLER:** Yeah, I guess I don't see an alternative so I'm happy to agree to that and reserving rights to bring it up if --

**THE COURT:** It's only 11 days from now at this point.

**MS. SCHUYLER:** Yeah.

**THE COURT:** Okay. Let me go back to the second -- let's see.

Okay. We have the attorney's eyes' only issue, let me see, so things that are really left. Plaintiffs -- let's see and then we have issue 2, 4, 5 would be Midjourney.

**MS. SCHUYLER:** Correct, I think that's right.

**THE COURT:** Some agreements. Okay. Do we want to pick a day and talk about those issues, plaintiff's AEO prompts and Midjourney 2, 4, 5, maybe we can do that sooner rather than later, since you've already provided the information.

**MR. SINGER:** Is this going to be -- so okay. So we have additional issues that will be --

**THE COURT:** That's a different day. This is to get these three -- these four things done. I think if we pick a new date and set aside an hour and a half, we can get these four things done and do it in the next week or so since you don't have to do anything.

So I'm just trying to figure out when is there a good chunk of time. How about Monday afternoon, the 26th or Tuesday morning the 27th, both look pretty open, I can carve out a chunk of time.

**MR. SINGER:** So, Lauren, Ms. Greene, I can -- do you want to do -- let us know what's best for you between Monday afternoon or Tuesday morning and this is just for the stuff

that's already before the Court.

**THE COURT:** Yeah, and we can pick another day after that for future.

**MS. GREENE:** Yeah, both either Monday afternoon or Tuesday morning are open for me.

**THE COURT:** Mr. Oleksiuk?

**MR. OLEKSIUK:** For Midjourney Monday works, Tuesday would not.

**THE COURT:** Okay. You want to do -- okay. I have the -- I can do Monday 2 to 4, I'll try to hold that whole full -- I hope we won't need that, but I'll try to hold that whole block again. And again, apologies, I got dumped upon today by other duties that were beyond my capacity.

**MR. SINGER:** It's a good reminder that we're not your only case in the world.

**THE COURT:** No, I have 4 -- over 400 and then you may have read about there was this Federal Express mass action which had to be certified, I got 200, I got all 200. I actually laughed out loud. Nothing's happened yet, but I got 200 in a day.

Okay. So does that work, Monday afternoon, 2 to 4? Okay. Let's pick a date in the future you're going to keep working through on issues and you're going to need some time. But so should we look at like the week of November 9 for a reconvene on fresh issues? Does that feel like enough time,

but not too much time?

**MS. SCHUYLER:** Or sooner.

**THE COURT:** Or do you think you'll have enough time? I mean, you both keep telling me that you have so much on your plate.

**MR. SINGER:** There's so many issues like teed up. We want to -- we do want to take it further and see how much we can resolve. There is, you know, like stuff that we mentioned today that we can get closer on.

**THE COURT:** Okay.

**MR. SINGER:** But, you know, there's no shortage of issues and we do want to --

**THE COURT:** Okay. So I can do like November 3rd or 4th, I can't do the 5th or the 6th. I can do the 9th or the 10th. So how about those for options?

**MR. SINGER:** Ms. Brandeisky and Ms. Greene?

**MS. BRANDEISKY:** Yeah, I can make any of those days work.

**MR. SINGER:** Do you want to say the 9th?

**MS. GREENE:** The same, I could also make any of those days work.

**MR. SINGER:** Okay. What about you guys at Cooley, the 9th, is that okay?

**MR. LAUTER:** For me. Yeah.

**THE COURT:** No preference? Did you say the 9th

sounds preferable, Mr. Singer?

**MR. SINGER:** I think we can do the 9th, yes.

**THE COURT:** Okay. Then how about 10 to noon on the 9th?

**MR. SINGER:** For the issues that like that we're talking about with Ms. Brandeisky, which are for today, you know, if -- because again it's costing us a lot of money and time to not have what we think that we're entitled to, is that something that we could at least have the Court check in on something since it's from today at the sort of Monday's IDC, is that helpful, Kara, or not? I guess if we're not going to get anything more from the other side, it depends, I just don't want that issue -- that's an issue that's a today issue, that is, the meter is running, we've got, you know, a lot going on there and if there's something --

**THE COURT:** Okay. Well, let me think about it. I haven't -- I hear you, that makes sense. I haven't figured out what to do in terms of setting deadlines. But what I'm going to try to do which is what I've tried to express is to try to set the conditions to motivate both sides to reach a reasonable compromise as suggested on that issue.

**MR. SINGER:** Okay. Thank you, Your Honor.

**THE COURT:** Okay. So is that -- so we've got Monday, 10/26, 2 to 4 p.m. and then we have Monday, 11/9, 10 a.m. to noon. Okay? All right. Well thank everyone again for bearing

with me and being flexible today.

**ALL:** Thank you, Your Honor.

**THE COURT:** Goodbye, everyone.

**(Proceedings concluded at 2:40 p.m.)**

*** * * * ***

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

October 23, 2026

Signed Dated

*TONI HUDSON, PRESIDENT*